UNITED STATES, Appellee,

v.

Herman RIOS, Jr., Staff Sergeant,
U.S. Air Force, Appellant.

No. 97–0543.
Crim.App. No. 31877.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 4, 1998.

Decided Aug. 13, 1998.

**262**

For Appellant: *Richard T. McNeil* (argued); *Mary R. McCormick* and *Major Kevin P. Koehler* (on brief).

For Appellee: *Captain Mitchel Neurock* (argued); *Colonel Brenda J. Hollis* and *Lieutenant Colonel Michael J. Breslin* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of rape, forcible sodomy, assault and battery, and committing indecent acts and liberties with a child, in violation of Articles 120, 125, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, 928, and 934, respectively. The victim of all the offenses was appellant's 14–year–old step-daughter, MR. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 18 years, and reduction to the lowest enlisted grade. The Court of Criminal Appeals slightly modified the conviction of assault and battery but otherwise affirmed the findings and the sentence. 45 MJ 558 (1997). Appellant also filed a petition for new trial, which was referred to the Court of Criminal Appeals in accordance with Article 73, UCMJ, 10 USC § 873, and RCM 1210(e), Manual for Courts–Martial, United States (1995 ed.). In a separate, unpublished opinion, that court denied the petition for new trial.

Our Court granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE TAPE–RECORDING OF THE "PRETEXT" TELEPHONE CONVERSATION WHERE AIR FORCE INVESTIGATORS ADMITTED THAT THE CALL WAS PLACED TO ELICIT INCRIMINATING STATEMENTS FROM APPELLANT WITHOUT HAVING TO FIRST INFORM HIM OF HIS ARTICLE 31 RIGHTS, WHERE AGENTS SUPPLIED APPELLANT'S DAUGHTER WITH QUESTIONS TO ASK AND DIRECTED THAT SHE CONTINUE TO ASK THOSE QUESTIONS UNTIL RECEIVING A RESPONSE, AND WHERE APPELLANT'S MINOR DAUGHTER DID NOT UNDERSTAND THE TERMS OF THE CONSENT FORM SHE SIGNED.

## II

WHETHER THE AIR FORCE COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL WHERE NEWLY DISCOVERED EVIDENCE DEMONSTRATED THAT THE OFFENSES DID NOT OCCUR AND THAT APPELLANT'S DAUGHTER HAD PERPETRATED A FRAUD ON THE COURT–MARTIAL.

We resolve both issues against appellant.

### I.  Pretext Telephone Call

Appellant attacks the admissibility of the pretext telephone call on three grounds: (1) violation of Article 31, UCMJ, 10 USC § 831; (2) lack of valid consent by MR to the monitoring and recording of the conversation; and (3) lack of proper authorization for monitoring the telephone call.

### A.  Facts

On January 11, 1995, MR told one of her school teachers that she "want[ed] to file a report" against appellant for physically abusing her.  MR was 14 years old at the time.  On January 9 appellant had beaten her with a military web belt and buckle.  MR was visibly bruised when she returned to school on January 11.  MR then reported the beating incident to a school counselor and a school nurse and was taken to David Grant Medical Center at Travis Air Force Base, California.  While at the medical center, she was interviewed by Special Agent (SA) Kingi, a member of the Air Force Office of Special Investigations (OSI).  SA Kingi was accompanied by other OSI agents and a civilian policeman from Fairfield, California.

MR initially complained only about physical abuse, but after she learned that she might be returned home, she accused appellant of sexual abuse, and she was then placed in foster care.

On January 13, 1995, SA Kingi asked MR if she would be willing to call appellant on the telephone and attempt to elicit a response from appellant about her allegations of sexual abuse.  MR agreed and signed a written consent to the monitoring and recording of a telephone conversation with appellant.  The consent form includes the following:

> With knowledge of the foregoing, and of my right to refuse, I expressly agree to allow the above named investigator, and any designated assistants, to monitor and record the above described conversations as they may occur, including any conversations with others which may incidentally occur during activities directed at the individual(s) named above.
>
> I further expressly agree that the contents of such conversations may be released for use as evidence in any administrative or judicial proceedings.
>
> Before deciding to give my consent, I carefully considered this matter.  I am giving my consent voluntarily and of my own free will, without having been subjected to any coercion, unlawful influence or unlawful inducement and without any promise of reward, benefit, or immunity having been made to me.

MR testified that the pretext telephone call was suggested by the Fairfield policeman and agreed to by the OSI.  When questioned about her written consent to the pretext call, she testified that she understood she was "agreeing to having that phone call recorded."  She understood that she did not have to make the call and did not have to sign the consent form.  She testified that she was not threatened, forced, or tricked.  She testified that she thought about it for approximately 10 minutes before signing the consent.  Asked whether she had any doubts about making the call, she testified that she did not, because "[she] just thought it was right to— [she] was curious as to what he was going to say anyway, so [she] wanted to call."

MR admitted that she did not understand the terms "coercion," "unlawful influence," "unlawful inducement," and "immunity."  She did not contact her mother, her aunt (appellant's sister, who lived with them), or anyone else for advice.  Asked if she felt that she had a choice to consent or withhold consent, she answered, "Yes." Asked what she thought would have happened if she had refused to consent, she answered, "I don't know."

Appellant's home had been searched and several items of physical evidence removed on January 12. Appellant's sister had been present during the search. The OSI agents knew that appellant was due to return from a period of temporary duty on January 13, and they thought it important to make the telephone call before appellant was made aware of the ongoing investigation. Because time was of the essence, the OSI commander gave oral approval of an emergency request for consensual telephonic interceptions under paragraph 4.3.3.1 of Air Force Instruction 71–101 (22 July 1994). SA Kingi then followed up with a written record and justification to the Air Force General Counsel.

The OSI contacted Lieutenant Colonel (LtCol) Stearns, appellant's commander, and secured his agreement to tell appellant to go home and call MR as soon as appellant returned to Travis Air Force Base. Appellant returned in the late afternoon or early evening. Appellant's sister met him when he returned, hugged him, and whispered in his ear that MR was making allegations of sexual abuse against him. Then an officer approached appellant and told him to leave his bags and report immediately to LtCol Stearns' office. Appellant reported to LtCol Stearns, who immediately told him, "You need to call [MR]." LtCol Stearns gave him a piece of paper with the words "Call [MR]" and a telephone number and told him to go home and call her.

Appellant testified that he believed LtCol Stearns had ordered him to call MR. However, when trial counsel asked appellant whether he believed that LtCol Stearns would discipline him if he did not call MR, appellant responded, "Colonel Stearns was not on my mind when I was speaking with [MR]."

MR called appellant from the OSI office within a few minutes after appellant arrived home. Appellant was noncommittal and did not respond directly to MR's accusations.

### B. The Law

#### 1. Article 31 Warnings.

Article 31(b) provides:

No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Mil.R.Evid. 305, Manual, *supra*, implements Article 31(b). Mil.R.Evid. 305(b)(1) defines "person subject to the code" as including "a person acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(2) defines "interrogation" as including "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."

In *United States v. Duga,* 10 MJ 206, 210 (1981), this Court held that the warning requirement of Article 31(b) "applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." Thus, this Court held that Article 31(b) warnings are required only if:

(1) a questioner subject to the Code was acting in an official capacity in his inquiry ...; and

(2) ... the person questioned perceived that the inquiry involved more than a casual conversation.

In this case MR called appellant at the request of the OSI. Thus, under the definition in Mil.R.Evid. 305(b)(1), MR was a person "subject to the code." However, the second prong of *Duga* was not met, because there was not an element of coercion based on "military rank, duty, or other similar relationship." Appellant thought he was talking to his daughter, not an interrogator or military superior. To the extent that appellant interpreted LtCol Stearns' directive to go home and call MR as an order, it had no effect on appellant's subsequent conversation with MR. As appellant admitted during his testimony, "Colonel Stearns was not on [his]

mind" during the conversation. Accordingly, we hold that there was no requirement to advise appellant of his rights under Article 31(b).

### 2. Validity of MR's Consent.

■ Appellant contends that MR, a 14–year–old minor, was legally incapable of consenting to the monitoring and recording of her telephone conversation with appellant. We disagree. In a Fourth Amendment context, minors may give third-party consent to a search. *Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir.1995); *see United States v. Clutter*, 914 F.2d 775, 778 (6th Cir.1990) (12 and 14–year–old boys validly consented to search); *see also State v. Smart*, 136 N.H. 639, 622 A.2d 1197, 1212 (1993) (gives "great deference" to trial court's finding that 16–year–old girl was "of sufficient maturity" to be capable of consenting to police recording of her conversation with defendant).

■ Whether there was actual consent, as opposed to mere submission to authority, is a question of fact to be resolved by examining the totality of the circumstances. *United States v. Kitts*, 43 MJ 23, 28 (1995). We hold that the military judge did not err by ruling that MR was legally capable of consenting, and that his finding that MR actually consented is supported by the evidence of record.

### 3. Authorization for Monitoring.

■ Appellant does not contest the validity of the procedures outlined in Air Force Instruction 71–101. Instead, he asserts that the OSI agents improperly invoked the emergency approval-authority provisions, which allow the OSI commander to approve telephonic monitoring instead of following the usual procedure of obtaining approval of the Air Force General Counsel before the call is monitored.

The military judge ruled that the OSI's invocation of the emergency procedures was proper. We agree. The pretext telephone call could succeed only if appellant was unaware that the investigation was underway. Appellant's sister, who resided in the household, was present when appellant's house was searched and physical evidence seized, in-cluding bedding, two pornographic videotapes, and the trash from appellant's bathroom that produced the deoxyribonucleic acid (DNA) evidence. Even these emergency procedures were less than successful, because appellant's sister met him upon his return and warned him of MR's complaint to the authorities. We hold that the military judge did not err by ruling that the monitoring and recording were properly authorized.

## II. Petition for New Trial

### A. Facts

MR testified that she was 15 years old at time of trial, having turned 15 in February 1995, shortly after the last alleged offenses. She testified that appellant first abused her when she was 12 years old by fondling and "french kissing" her. MR had a boyfriend, but both she and the boyfriend denied having sexual intercourse. MR testified that appellant shaved her pubic hair so that it would be easier for him to have intercourse with her.

MR testified that, on some occasions, appellant would invite her into his bedroom to watch pornographic videotapes. She identified a videotape labeled "15 shows 1 hour." She testified that appellant was naked while watching the videotape, and that he told her to remove her clothing. While watching the videotape, appellant expressed interest in performing the same acts as depicted on the videotape.

MR identified a second videotape entitled "When Harry Wet Sally." She testified that, while watching the videotape, appellant put his finger in her vagina and they performed oral sex on each other. She testified that, on two other occasions, appellant had anal sex with her.

MR testified that appellant had sexual intercourse with her on January 10, 1995, in his bedroom. She testified that, after the intercourse was completed, she wiped her vagina with a piece of toilet tissue, and appellant wiped his penis with the same piece of tissue.

MR admitted that she initially complained only about appellant's physical abuse. When she was told that she would have to return

home, she then accused appellant of raping her.

A search of appellant's home on January 11, 1995, resulted in the seizure of numerous items, including the two videotapes identified by MR and five pieces of toilet tissue found in the trash can in appellant's bathroom. Serological examination of the toilet tissue revealed the presence of semen on three pieces of toilet tissue. DNA examination of the semen identified DNA profiles matching appellant's on three pieces of tissue. One of the three pieces contained DNA matching both appellant and MR. The laboratory examination was unable to determine what kind of bodily fluid produced the DNA consistent with MR's. In scientific parlance, a laboratory finding that DNA is "consistent with that of the source of the crime sample" is what laymen call a "match." *Reference Manual on Scientific Evidence* at 297 (Federal Judicial Center 1994). According to the laboratory report, the statistical probability of a coincidental "match" between the DNA on the toilet tissues and someone other than appellant was 1 in 2 million. The probability of a coincidental "match" between the DNA on one toilet tissue and MR's was 1 in 19 million.

MR was examined by a medical doctor for physical evidence of sexual abuse. The examining doctor initially thought that her hymen was not intact but, upon more careful examination, found it intact. He testified that the condition of MR's hymen was "not inconsistent with being sexually active." The doctor attempted to take pubic hair samples from MR but found it difficult because her pubic area was shaved. MR was tested for venereal disease and found to have contracted chlamydia, a sexually transmitted disease.

The prosecution presented Solano County records showing that on January 16, 1995, while a supervised visit with MR was being coordinated for appellant, he asked a social services worker, "If a person has sex with a child that seemed to like it, it's different isn't it?"

The strategy of the defense on the sexual-abuse charges was to attack MR's credibility and explain away the scientific evidence. Although appellant testified on the merits, he limited his testimony to the assault-and-battery charge. Both appellant and his first wife testified that he was MR's natural father. This statement was contradicted by the defense DNA expert, who testified that the DNA evidence "constitutes an exclusion of paternity."

Appellant testified that he was divorced from MR's mother in 1986 or 1987. Although MR's mother initially was given custody, appellant obtained custody of MR in 1989, because her stepfather had sexually molested her and her mother had physically abused her.

Appellant testified that he had "grounded" MR on January 8, 1995, because he found a postcard in her room that he thought was inappropriate for her age. On Monday, January 9, MR violated the "grounding" by going to her boyfriend's home after school. Appellant went to the boyfriend's house, found her hiding in a closet, and took her home. At home, appellant told MR to take off her dress, put on a T-shirt, and come downstairs. She came downstairs wearing a bra and panties, but no T-shirt. Appellant then spanked her with a military web belt, striking her "on her backside" six or eight times. Appellant testified that he spanked MR "[h]arder than I have ever spanked her." He then "counseled" her and sent her to her room.

The defense presented three witnesses concerning MR's truthfulness. MR's 10–year–old half-sister testified that MR is not a truthful person. Appellant's second wife testified that MR is not an honest person and she will lie to get what she wants. Finally, the principal of MR's elementary school testified that MR seeks attention and that she "would question what [MR] says."

The defense presented evidence from a medical doctor that appellant was twice tested for chlamydia in March 1995, and that the tests were negative. On cross-examination, however, the doctor testified that, if appellant had chlamydia in January and took medication, there was a "very strong chance" that the tests in March would be negative. In rebuttal, the prosecution presented evi-

dence from appellant's medical records that appellant had been given a prescription for doxycycline in early 1994. Doxycycline is an antibiotic used to treat chlamydia.

On July 30, 1996, MR signed a statement recanting her accusations against appellant. This statement is accurately and perfectly typed and includes a jurat prepared for execution by a California notary public. The documents accompanying the statement recite that appellant's second wife went to the Sacramento Children's Home, where MR was residing, and obtained her signature. The statement was mailed to the civilian attorney who filed the petition for new trial.

In her recantation, MR states that she was angry with appellant for punishing her and embarrassed because her friends knew she had been spanked. She states that she falsely accused appellant to "get back at him" and "to get out of the house." She states appellant did not rape her, have oral sex with her, touch her, or show her pornographic movies.

On September 5, 1996, appellant filed a petition for new trial, supporting his petition with MR's recantation and juvenile court records showing that MR was placed in a foster home on January 12, 1995, and that she was moved to a second foster home on June 22, 1995, because she ran away from her first foster home. She was removed from the second foster home on February 8, 1996, after she falsely accused a 27–year–old grandson of her foster parents of attempting to kiss her and fondle her breast. MR was then placed in the Sacramento Children's Home.

The social services assessments attached to the court records diagnose MR as manipulative and seeking attention by fabricating stories "for no apparent reason" except to get attention.

The Court of Criminal Appeals denied the petition for new trial in a brief opinion, setting out its rationale as follows:

The burden in a new trial petition rests squarely on the petitioner. We find that MR's in court testimony was both credible and corroborated. Furthermore, it is not uncommon for child abuse victims to re-

cant their testimony. We do not find appellant's submissions believable.

Unpub. op. at 2.

### B. The Law

Article 73, UCMJ, 10 USC § 873, allows an accused to petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." RCM 1210(f)(2) provides:

A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

RCM 1210 is generally consistent with Fed.R.Crim.P. 33. *See* Drafters' Analysis of RCM 1210, Manual, *supra* at A 21–88. Subsection (f) is also based on *United States v. Bacon,* 12 MJ 489 (CMA 1982), and *United States v. Thomas,* 11 MJ 135 (CMA 1981). *Id. Thomas* quotes *United States v. Chadd,* 13 USCMA 438, 32 CMR 438 (1963), in which the criteria set out in RCM 1210(f) were adopted.

■ Petitions for new trial "are generally disfavored." *United States v. Williams,* 37 MJ 352, 356 (CMA 1993). They should be granted "only if a manifest injustice would result absent a new trial ... based on proffered newly discovered evidence." *Id.*

*Bacon* set out the standard for ruling on a petition for new trial. In *Bacon* this Court held that "the determination of sufficient grounds for granting a petition for new trial in the military rests 'within the [sound] discretion of the authority considering ... [that] petition.'" 12 MJ at 492 (citations omitted). When a petition for new trial is considered by a Court of Military Review (now Court of Criminal Appeals), "the Courts of Military Review have the 'prerogative' of

weighing 'testimony at trial against the' post-trial evidence 'to determine which is credible.'" *Id.*

The Courts of Criminal Appeals "are free to exercise ... [t]heir factfinding powers." *Id.* The only limit on their factfinding powers is that their "broad discretion must not be abused." *Id.*

■ Congress intended that military practice with respect to petitions for new trial mirror practice in federal civilian courts. *Williams,* 37 MJ at 356 n. 3. In federal civilian practice, "[t]he evidence which serves as the basis for such a motion [for a new trial] may be judged by the reviewing body both in terms 'of credibility as well as of materiality.'" *Bacon,* 12 MJ at 492, quoting *Jones v. United States,* 279 F.2d 433, 436 (4th Cir.1960); *United States v. Maddox,* 444 F.2d 148, 152 (2d Cir.1971); *United States v. Gantt,* 298 F.2d 21 (4th Cir.1962).

In federal civilian practice, "[g]enerally, a motion for new trial may be decided upon affidavits without evidentiary hearings." *United States v. Metz,* 652 F.2d 478, 481 (5th Cir.1981); *accord United States v. Montilla-Rivera,* 115 F.3d 1060 (1st Cir.1997); *United States v. Green,* 89 F.3d 657 (9th Cir.1996); *United States v. Johnson,* 12 F.3d 827 (8th Cir.1994); *United States v. Blackburn,* 9 F.3d 353 (5th Cir.1993); *United States v. Hedman,* 655 F.2d 813 (7th Cir.1981); *United States v. Herman,* 614 F.2d 369 (3d Cir. 1980); *United States v. Turner,* 490 F.Supp. 583 (E.D.Mich.1979).

■ Petitions for new trial based on a witness's recantation "are not viewed favorably in the law." *United States v. Giambra,* 33 MJ 331, 335 (CMA 1991). They should not be granted unless "[t]he court is reasonably well satisfied that the testimony given by a material witness is false." *Id.,* quoting *Larrison v. United States,* 24 F.2d 82, 87 (7th Cir.1928).

Recantations of trial testimony are viewed by federal courts with "extreme suspicion." *United States v. Nixon,* 881 F.2d 1305, 1311 (5th Cir.1989); *United States v. Santiago,* 837 F.2d 1545, 1550 (11th Cir.1988); *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.

1987); Moore's Federal Practice, § 633.05[5][a] (3d ed.1998); *see also Olson v. United States,* 989 F.2d 229, 231 (7th Cir. 1993) (recantation treated "with skepticism"); *United States v. Carbone,* 880 F.2d 1500, 1502 (1st Cir.1989) ("considerable skepticism"); *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir.1980) (recantation "looked upon with downright suspicion"); *United States v. Lewis,* 338 F.2d 137, 139 (6th Cir. 1964); Charles Alan Wright, *Federal Practice and Procedure* § 557.1 at 350 (1982) ("utmost suspicion").

■ Our standard of review on petitions for new trial is deferential. We review only for an abuse of discretion. *United States v. Sztuka,* 43 MJ 261, 268 (1995); *see Nixon,* 881 F.2d at 1311 ("clear abuse of discretion").

### C. Discussion

■ We hold that appellant has not met his burden of convincing this Court that MR's trial testimony was false. Unlike the situation in *Giambra,* the trial in this case was not a "swearing contest." Since appellant limited his testimony to the charge of assault and battery, MR's trial testimony concerning the sexual abuse was not directly contradicted. Her trial testimony was corroborated by scientific and physical evidence. The DNA evidence corroborated her testimony that appellant and she had intercourse in appellant's bedroom and then both wiped themselves with a piece of toilet tissue. Her testimony that appellant shaved her pubic area was corroborated by the testimony of the examining medical doctor. MR was found to have chlamydia, a sexually transmitted disease. While the source of her chlamydia was not scientifically determined, this evidence corroborated MR's testimony that she had engaged in sexual intercourse. MR's testimony that appellant showed her pornographic videotapes was corroborated by seizure of two such tapes. Finally, MR's testimony was corroborated by appellant's oblique admission when he asked the social worker whether "it's different" if a child enjoys sex with an adult.

The clinical evaluations included in the juvenile court records proffered by appellant

portray MR as troubled, manipulative, and untruthful. These evaluations make the same point as was made at trial through the testimony of MR's step-mother, younger sister, and former school principal. Furthermore, this evidence of manipulation and dishonesty reflects as much on MR's post-trial recantation as it does on her trial testimony.

Finally, the circumstances of MR's recantation give us pause. MR signed the statement after being removed from two foster homes and placed in a group home. She recites her regret at being responsible for breaking up her family. MR did not spontaneously recant to a neutral party or someone responsible for her welfare. Instead, she signed a document which, on its face, is a professionally prepared legal document, accompanied by a recital that her signature on the document was obtained by appellant's wife. These circumstances reinforce rather than attenuate the extreme suspicion with which post-trial recantations should be viewed. After examining the newly proffered evidence and comparing it to the trial evidence, we are not "reasonably well satisfied" that MR's trial testimony was false. Accordingly, we hold that the court below did not err by denying appellant's petition for a new trial.

*Decision*

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

EFFRON, Judge, with whom SULLIVAN, Judge, joins (dissenting):

The use of pretextual telephone calls may constitute a legitimate investigative technique under the appropriate circumstances, but these calls may not be used in a manner that undermines the protections of Article 31, UCMJ, 10 USC § 831. The rights' warning requirements of Article 31 are designed to protect servicemembers against "the effect of superior rank or official position," *United States v. Gibson*, 3 USCMA 746, 752, 14 CMR 164, 170 (1954), where "there might be subtle pressure on a suspect to respond to an inquiry." *United States v. Duga*, 10 MJ 206, 210 (CMA 1981); *see United States v. Harvey*, 37 MJ 140, 143 (CMA 1993). The reviewing court's inquiry focuses on the status of the questioner and the perception of the accused. As to the latter, the court must ask "whether the person questioned perceived that the inquiry involved more than a casual conversation." *United States v. Duga*, supra.

In *Duga*, this Court, after focusing on the casual nature of the conversation between the accused and his friend and the fact that the accused did not perceive the inquiry to be official, concluded that Article 31 warnings were not required. 10 MJ at 211 ("casual conversation between comrades"), and at 212 ("no subtle coercion"); *see also Harvey*, supra at 143–44. Similarly, the inquiry in undercover cases is whether the environment is coercive or informal. *See, e.g., Gibson, supra* at 753, 14 CMR at 171 (questioning by fellow inmate in pretrial confinement was a "conversation between equals").

The role of appellant's commander in setting up the conversation in the present case distinguishes it from our precedents. *See, e.g., United States v. White*, 48 MJ 251 (1998) (no coercion on the accused to participate in the call); *cf. United States v. Lemaster*, 40 MJ 178 (CMA 1994) (OSI agent and informant as seller and buyer in drug transaction constituted improper inducement). In the case before us, immediately upon appellant's return from a temporary duty assignment, his commander told him to go home and call his daughter. Appellant testified that he believed that his commander's directive was an order. The transcript of the telephone conversation also indicates that, although appellant was suspicious of the call, he believed that he had to respond to the questions from his daughter. He asked her several times why she had called him, told her that she did not sound like herself, stated that she was acting like a lawyer, and said that he needed to contact a lawyer.

Because appellant's commander directed appellant to participate in the conversation, the fact that the commander "was not on [appellant's] mind" after the call began is not

particularly significant. The record makes it clear that appellant did not view this conversation as "casual" and that he was compelled to participate in it. Under those circumstances, Article 31 warnings were required under *Duga*.

At trial, the Government used appellant's responses to his daughter's questions against him, even though he did not confess to the charged offenses during the telephone interrogation. In the absence of a confession, the Government sought to prove appellant's guilt by citing his failure to deny the accusations when he was confronted by his daughter during the telephone call. *Cf. United States v. Cook*, 48 MJ 64 (1998) (Once accused is under investigation, his silence and failure to deny accusations is not relevant to his guilt and cannot be used against him.). In short, appellant was compelled by a superior officer to participate in an unwarned interrogation and then convicted when he failed to deny the interrogator's accusations. Article 31 protects servicemembers against being compelled to participate in an unwarned interrogation when the result of the interrogation could be used to obtain a conviction. *See,*

*e.g., Harvey, supra* at 143; *Duga, supra* at 210; *Gibson, supra* at 752, 14 CMR at 170.

The military judge compounded these problems by applying the incorrect legal standard in ruling on the defense's motion to suppress. The military judge focused on whether the conversation "involved the coercive pressure of a custodial interrogation," which is the proper standard for warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), not Article 31 warnings. Article 31 protections may apply even if there is no "custodial interrogation." The Court of Criminal Appeals did not acknowledge or correct this error.

Because there is a direct relationship between the content of the audiotape (*i.e.*, appellant's failure to deny the daughter's allegations) and appellant's petition for new trial—which is based on the daughter's recantation of her statement—we should remand this case for a hearing under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967), to consider the issue of the reliability of the daughter's recantation and whether the petition for new trial should be granted.