CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, HERRING, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant SHAUN B. MARCUS**
**United States Army, Appellant**

ARMY 20130795

Headquarters, United States Army Maneuver Center of Excellence and Fort Benning
Lee Deneke, Military Judge (arraignment)
Charles A. Kuhfahl, Military Judge (trial)
Colonel James F. Garrett, Staff Judge Advocate (pretrial)
Lieutenant Colonel Charles C. Poche, Staff Judge Advocate (post-trial)

For Appellant: Captain Robert H. Meek, III, JA; C. Ed Massey, Esquire (on brief); Captain Patrick J. Scudieri, JA; Gary Myers, Esquire (on reply brief and brief on supplemental assignments of error).

For Appellee: Colonel Mark H. Sydenham, JA; Major A.G. Courie III, JA; Major Steven J. Collins, JA; Lieutenant Colonel Kirsten M. Dowdy, JA (on brief); Colonel Mark H. Sydenham, JA; Major Steven J. Collins, JA; Lieutenant Colonel Kirsten M. Dowdy, JA (on brief).

19 February 2016

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of abusive sexual contact with a child, two specifications of indecent liberties with a child, rape, forcible sodomy, and three specifications of

assault consummated by battery, in violation of Articles 120, 125, and 128[1], Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, and 928 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for thirty years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

Appellant's case is now before this court pursuant to Article 66, UCMJ. Appellant raises five assignments of error, one of which merits discussion but not relief.

## BACKGROUND

Appellant's charges all relate to sexual crimes perpetrated against his fourth wife and [2]her underage sister. The government's theory, which was supported by testimony as well as evidence gathered in a forensic examination of appellant's computer, was that appellant was sexually excited by rape fantasies—fantasies that became a reality for his wife. In support of its case, the government sought to introduce under Military Rule of Evidence [hereinafter Mil. R. Evid.] 413 and Mil. R. Evid. 414 the testimony from other individuals who described similar criminal acts by appellant.[3] It is the post-trial recantation of one of those Mil. R. Evid. 413 witnesses, appellant's second wife—Ms. MV, which merits discussion.

Statements of Ms. MV were introduced into the proceedings at four different instances.

During a pretrial motion hearing, the defense and government stipulated that if called to testify, Ms. MV would state appellant forced her to have anal sex against her will. Specifically:

> One time in our marriage he forced me to have anal sex
> against my will. We had argued that night and when he
> came back into the room he grabbed me and held me down
> and tried to penetrate me anally. I told him 'No' and tried
> to move away from him, but he held me down and told me
> that if I wanted our marriage to work, then I would let him

---

[1] Appellant was convicted of two charged specifications of assault consummated by battery and one specification of assault consummated by battery as a lesser included offense of a charged aggravated assault.

[2] Corrected.

[3] These acts predated appellant's entry into the Army.

> do it.  I didn't want to, and he forced his penis into my
> anus.

The stipulation also included expected testimony that the two had "rough" sex, that appellant would ignore her use of the "safe word," punched her, and forced her to have vaginal sex.

Ms. MV was also called by the defense to testify in a closed session in support of the defense's Mil. R. Evid. 412 motion.  Ms. MV testified during cross-examination about sexual intercourse that involved slapping, hair pulling, choking, and the initial use of a "safe word."  She also testified that the conduct devolved into nonconsensual punching, choking to the point of blacking out, forcible anal sex, and appellant telling her that she was no longer allowed to use the safe word because she "used it too much."

At trial, Ms. MV was called by the government.  After testifying to foundational questions, including that she was married to appellant from 2001-2002, her entire testimony on direct was as follows:

> Q: Directing your attention to 2001, when you were
> married to Sergeant Marcus, did there come a time when
> Sergeant Marcus acted inappropriately with you sexually?
>
> A: Yes.
>
> Q: Tell the Court what he did.
>
> A: Towards the end of our marriage [appellant] had come
> back from Germany to visit and we were having problems.
> The last night there we went to a hotel and stayed in a
> hotel.  It was supposed to be romantic and work on our
> marriage and he wanted to have anal sex and I said "no."
> He said, "Well, if you want the marriage to work you're
> going to do it."  And I told him it hurt and I didn't want to
> do it anymore and he put my head down on the bed and
> told me to shut up, and I just finally gave in.
>
> Q: When you told [appellant] that it hurt, at that moment,
> where was his penis?
>
> A:  In me.
>
> Q:  And did he remove his penis after you said that?

A: No.

Q: What did he do?

A: He kept going.

On cross-examination by the defense, Ms. MV was even more emphatic that appellant had assaulted her.

Q: When you made the statement a few moments ago . . .
"I told him it hurt, I didn't want to do it anymore," do you
remember stating that; is that right?

A: Yes.

Q: Is that indicative that at some point during that
incident that you were engaging in consensual anal sex
with him on that day?

A: No.

Q: Your testimony is that no aspect of that was
consensual, is that right?

A: Yes.

After trial, Ms. MV signed two affidavits purporting to recant her testimony at trial, alleging that her testimony against appellant was improperly induced through threats and promises by government trial counsel.[4] These two affidavits raise the issue of whether appellant is entitled to a new trial based on either new evidence or because prosecutorial misconduct led to a fraud upon the court.

## DISCUSSION

Although not phrased as such by appellant, we believe the proper lens through which to resolve his claims are to treat them as a petition for a new trial under Article 73, UCMJ, and R.C.M. 1210. The articles of the UCMJ provide several paths to this court:

---

[4] The first affidavit was submitted as part of the defense submissions under Rule for Courts-Martial [hereinafter R.C.M.] 1105. We granted a motion to attach the second affidavit (as a defense appellate exhibit) to appellant's reply brief.

> Article 62 addresses interlocutory appeals by the government;
>
> Article 6b, in addition to the All Writs Act (28 U.S.C. § 1651), provides for this court to consider certain other writ petitions;
>
> Article 66 provides for automatic review of the findings and sentence of qualifying court-martial convictions;
>
> Article 69 allows for review of non-qualifying convictions when sent to the court by The Judge Advocate General of a respective service; and
>
> Article 73 provides for petitions for new trial based on new evidence or allegations of fraud on the court-marital.

In the case of a petition for a new trial, "[i]f the accused's case is pending before a Court of Criminal Appeals . . . the Judge Advocate General shall refer the petition to the appropriate court for action." UCMJ art. 73.

Appellant and his counsel were unaware of MV's recantations and allegations until after the sentence was announced and court was adjourned. Appellant's new evidence, which was never litigated or subject to adversarial testing, is not a direct attack on appellant's conviction. Appellant, for example, does not allege the military judge committed error, plain or otherwise. In other words, this is unlike cases where the evidence of prosecutorial misconduct is contained within the record of trial. *See, e.g., United States v. Frey*, 73 M.J. 245 (C.A.A.F. 2014) (trial counsel's improper sentencing argument); *United States v. Hornback*, 73 M.J. 155 (C.A.A.F. 2014) (trial counsel's repeated improper questions throughout trial eliciting objectionable testimony from multiple witnesses).

Therefore, we find that Article 73, UCMJ, provides the mechanism for us to consider evidence outside the record and initially address appellant's claims.[5] We believe our approach is consistent with the structure of the UCMJ and the nature of appellant's assigned errors.

The contrary view, that we should address this matter as a direct attack on appellant's conviction under Article 66, UCMJ, would be problematic. First, it

---

[5] Our focus here is identifying the proper means to initially address the assigned error. In a case where Article 73, UCMJ, provides no remedy, we will nonetheless still need to determine whether the findings "should be approved" under Article 66(c).

would be difficult to draw any clear boundary between when an allegation of new evidence or fraud on the court-martial should be initially addressed under Article 66 or Article 73. Second, by their nature, allegations such as appellant's were not preserved at trial. By considering this matter under Article 73, we avoid applying the unforgiving strictures of a plain error analysis to appellant's case. Put differently, in general, Article 73 allows redress for matters involving new evidence which the appellant could not have raised at trial and for which evidence outside of the record must be considered.

Article 73, UCMJ, allows an accused to petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Regarding new evidence, R.C.M. 1210(f)(2) provides:

> A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:
>
> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

Regarding fraud on the court-martial, R.C.M. 1210(f)(3) provides that "[n]o fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged."

"[Rule for Courts-Martial] 1210 is generally consistent with [Federal Rule of Criminal Procedure] 33." *United States v. Rios*, 48 M.J. 261, 267 (C.A.A.F. 1998). Our superior court has broadly adopted standards applicable to federal courts in reviewing petitions for a new trial. *Rios*, 48 M.J. at 268 ("Congress intended that military practice with respect to petitions for new trial mirror practice in federal civilian courts."). Petitions for new trial are generally disfavored. *Id.* at 267 (internal quotation marks and citation omitted).

In *Rios*, our superior court stated the courts of criminal appeals are "free to exercise . . . [our] factfinding powers" and we may weigh the "testimony at trial against the post-trial evidence to determine which is credible." *Id.* at 267-68 (internal quotation marks and citations omitted). However, later that same year in *United States v. Brooks*, our superior court clarified that "[t]he reviewing court does not determine whether the proffered evidence is true; nor does it determine the

6

historical facts. It merely decides if the evidence is sufficiently believable to make a more favorable result probable." 49 M.J. 64, 69 (C.A.A.F. 1998); *see also United States v. Cuento*, 60 M.J. 106, 112-13 (C.A.A.F. 2004). This latter interpretation in *Brooks* is consistent with the structure of the code, as our factfinding powers are contained in Article 66(c), not Article 73.[6]

Both *Rios* and *Brooks* agree that petitions for new trial are "generally . . . decided upon affidavits without evidentiary hearings."[7] *Rios* 48 M.J. at 268; *Brooks* 49 M.J. at 68 (quotation marks and citations omitted). Military practice, like federal civilian practice, makes an evidentiary hearing discretionary. Rule for Courts-Martial 1210(g)(1) provides: "The authority considering the petition may cause such additional investigation to be made and such additional information to be secured as that authority believes appropriate." In short, in considering a petition for a new trial, "the determination of sufficient grounds for granting a petition for new trial in the military rests within the [sound] discretion of the authority considering . . . [that] petition." *Rios* 48 M.J. at 267 (alterations in original) (internal quotation marks and citations omitted).

We do not believe an evidentiary hearing is required to resolve this matter. Ms. MV's recantation, when considered in the light of all other pertinent evidence, would not "probably produce a substantially more favorable result for the accused." R.C.M. 1210(f)(2)(c). Ms. MV's allegations of her fraud on the court-martial, even if taken as true, did not have a substantially contributing effect on a finding of guilty. R.C.M. 1210(f)(2)(C); R.C.M. 1210(f)(3). In other words, appellant has failed to meet his "heavy burden." *United States v. Cuento*, 60 M.J. at 112. However, some discussion is required to address the issues raised by Ms. MV's affidavits, and we will address each in turn.

---

[6] Similarly, our superior court has determined that our factfinding powers do not extend to collateral attacks on the conviction. The statutory language of Article 66(c) "clearly indicates that Congress intended a Court of Criminal Appeals to act as factfinder in an appellate-review capacity and not in the first instance as a trial court. This unusual appellate-court-factfinding power is not unlimited in scope but is expressly couched in terms of a trial court's findings of guilty and its prior consideration of the evidence." *United States v. Ginn*, 47 M.J. 236, 242 (C.A.A.F. 1997).

[7] We do not find our approach in this case to be in conflict with *Ginn*, 47 M.J. 236. First, both *Rios* and *Brooks* were decided after *Ginn*. Second, *Ginn* involved the more common claim of ineffective assistance of counsel—a collateral attack on a conviction—a circumstance where conflicting affidavits and the necessity for a factfinding hearing is far more likely. *Id*. at 241.

## A.  Fraud on the Court-Martial

### 1.  Coerced Testimony

In Ms. MV's first affidavit, she alleges "[t]he prosecutor manipulated me and had me believing that if I did not go and testify to what she wanted me to say, that she would contact my husband's command and go after myself and my family." In response to her initial affidavit, we granted the government's motion to submit an affidavit from the trial counsel as a government appellate exhibit.  In the affidavit, the trial counsel states that Ms. MV was a reluctant witness but was emphatic that Ms. MV was repeatedly told that she must testify truthfully.[8]

In Ms. MV's second affidavit, which specifically addresses the affidavit of the trial counsel, Ms. MV claims she "was manipulated into testifying against [appellant]."[9]  Further, Ms. MV does not claim the government told her to testify falsely.  Rather, Ms. MV makes clear that the "manipulation" was that the trial counsel discussed consequences with her if she refused to testify at all.  She states that after multiple calls from the prosecutors, "I was feeling scared that I could not refuse to testify."  After telling the trial counsel she did not want to testify, she claims a trial counsel told her "if you do not come we will subpoena you, if you don't follow the subpoena, you will go to jail and you might lose your kids." Finally, in regards to contacting her husband's command, she clarifies that she "was told that if I didn't come the prosecution would call my husband's unit."

Ms. MV's second affidavit (which is longer and more specific) clarifies any ambiguity within the first affidavit and solidifies that this is *not* a case in which Ms. MV was coerced into testifying falsely.  Rather, Ms. MV's complaint is that she was coerced into testifying at all.  It is also clear from the affidavit that Ms. MV believes that she had a legal choice as to whether she testified against appellant.  Of course, if properly subpoenaed, Ms. MV was not free to refuse to testify.  *See* UCMJ art. 47. A witness duly subpoenaed who unlawfully refuses to testify may be "fined,

---

[8] We mention the trial counsel's affidavit only to explain how Ms. MV, in her second affidavit, specifically responds to the trial counsel.

[9] Ms. MV also claimed in her second affidavit that the trial counsel told her not to speak with appellant or his lawyer.  If true, this would be of concern.  *See* UCMJ art. 46.  ("The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence . . . .").  However, appellant did not complain of this specific issue at trial or on appeal.  Additionally, it is clear that whatever the trial counsel may have said, the trial defense counsel was able to communicate with Ms. MV sufficiently that he could sign a stipulation of expected testimony and had the opportunity to examine Ms. MV prior to trial.

imprisoned, or both." UCMJ art 47(b). While Ms. MV may have felt compelled to testify, that is the very nature of compulsory process.

Accordingly, we do not find that there was a fraud on the court-martial that "had a substantial contributing effect on a finding of guilty or the sentence." R.C.M 1210(f)(3).

### 2. *Scope of Ms. MV's Testimony*

Ms. MV's affidavits also claim the trial counsel promised her that she would be able to testify that she still loves appellant and that she consented to all sexual acts. She believes the government broke that promise and states that she feels "betrayed" by the prosecution. She is correct in part. Neither party asked Ms. MV during the trial whether she still loved appellant. However, both counsel asked questions that elicited whether the sexual act between her and appellant that was the subject of her testimony had been consensual.

The government asked Ms. MV whether appellant had ever acted "inappropriately with you sexually?" After she answered in the affirmative, the government posed an open-ended question, asking her to "[t]ell the Court what he did." In response, Ms. MV then testified that she "told [appellant] that it hurt and I didn't want to do it anymore and he just put my head down on the bed and told me to shut up, and I just finally gave in."

On cross-examination, the defense counsel unsuccessfully attempted to elicit testimony from Ms. MV that the sexual encounter had begun consensually. Ms. MV specifically denied that any part of the encounter had been consensual. The defense counsel attempted to clarify the question, asking, "Your testimony is that no aspect of that was consensual, is that right?" Ms. MV agreed with the counsel's characterization of her testimony.

In other words, Ms. MV's claim that she was not allowed to testify as to whether the sexual act with appellant was consensual is compellingly disproven by the record. Ms. MV did have the opportunity to testify as to whether the act was consensual; and her testimony clearly stated that it was not.

As to Ms. MV's allegation that the government broke its promise that she could testify that she still loved appellant, we note as an initial matter that it is the counsel who determines what questions should be asked, not the witness. However, assuming that such a promise was made, the breach of that promise did not constitute a fraud upon the court-martial. Neither the promise nor its breach impeded the defense's cross-examination or mislead the factfinder. As to prejudice, given Ms. MV's inculpatory testimony, any testimony that Ms. MV still loved appellant would have had the effect of bolstering her credibility by demonstrating

that she was testifying *against* someone she nevertheless loved; perhaps improperly as the defense did not attack her motives or infer that she was biased. *See* Mil. R. Evid. 604(a).

## B. New Evidence

### 1. Post-Trial Recantation

Apart from the issue of whether there was a fraud on the court-martial, we must still address whether Ms. MV's post-trial affidavits constitute new evidence that warrants a new trial.

In her first affidavit, Ms. MV "recants" her trial testimony, stating "I never said no at any time" and "I agreed to everything we ever did." However, in her first affidavit Ms. MV also stated—referencing the assault that was the subject of her testimony—"I told him to stop and then just allowed him to continue what he was doing."

In her second affidavit, Ms. MV clearly states that appellant "never forced me to have anal or any other type of sex." Her second affidavit, prepared for this appellate review, does not attempt to give any explanation as to why her testimony has changed since trial. At points, the differences between her trial testimony and affidavits could be explained by an evolving sense or understanding of what is meant by the terms "force" and "consent."[10] At other points, however, the differences are irreconcilable.

We are not required, however, to resolve this matter decisively. Our role is to "merely decide[] if the evidence is sufficiently believable to make a more favorable result probable." *Brooks*, 49 M.J. at 69. We find that Ms. MV's affidavits so lack credibility as to make any change in the court-martial findings improbable. As discussed above, her claim that she was not allowed to testify as to whether she consented to appellant's assault is completely at odds with her actual testimony where she was provided that very opportunity. Her broad claim that appellant never forced her to have any type of sex is contradicted by her detailed testimony at both the Mil. R. Evid. 412 hearing and the trial that appellant repeatedly used violence to obtain sex. Additionally, Ms. MV's credibility is substantially undermined by her

---

[10] For example, at trial, when describing an event she characterized as nonconsensual, she testified, "I told him it hurt and I didn't want to do it anymore . . . and I just finally gave in." In her first affidavit's description of that same event, an event she describes as consensual, she states, "I told him to stop and then just allowed him to continue what he was doing." The factual description of this event is relatively consistent; it is her *characterization* of the event that changed dramatically.

clear (and candid) present bias in favor of appellant. In her first affidavit, Ms. MV states that in regards to appellant "I have loved him for 18 years and would do anything in my power for him!" and "I do not believe he belongs in prison." Furthermore, she demonstrates a clear animus towards the charged victim, stating, "[s]he knew how he was in the bedroom before she married him."

### 2. *Probability of More Favorable Result*

Finally, even if we were to find the recantations of Ms. MV to possess some credibility, the importance of her testimony must be considered within the scope of the entire trial. Appellant was not charged with any offense against Ms. MV, and Ms. MV provided no direct testimony on the charged offenses. While her testimony, admitted under Mil. R. Evid. 413 is not inconsequential, the government's direct exam (to include introducing her to the panel and its foundational questions) amounted to less than two pages of an 842-page record. In other words, the recantations are unlikely to produce a "substantially more favorable result" for appellant. R.C.M. 1210(f)(2)(C). This case is therefore unlike *Cuento*, which involved the recantation of a charged victim in a case where there was no corroborating evidence. 60 M.J. at 113. In *Cuento,* our superior court found that the court of criminal appeals erred in not ordering a factfinding hearing. *Id.* (quoting *United States v. Giambra*, 33 M.J. 331, 335 (C.M.A. 1991)) ("'When the alleged perjurer is the prosecutrix herself,' we remain disinclined to burden Appellant with mechanical application of a rigorous standard. Under the unique circumstances of this case, including the lack of any corroborating physical evidence . . . we find that the weight of [the] recantation cannot adequately be measured without a *DuBay* hearing before a military judge     . . . .").

### CONCLUSION

The findings and sentence are AFFIRMED.

Senior Judge HAIGHT and Judge HERRING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court