**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman First Class DUSTIN A. MILLER**
**United States Air Force**

**ACM 37869**

**17 January 2014**

Sentence adjudged 12 December 2010 by GCM convened at Charleston Air Force Base, South Carolina. Military Judge: Terry A. O'Brien.

Approved Sentence: Dishonorable discharge, confinement for 11 years, and reduction to E-1.

Appellate Counsel for the Appellant: Major Nathan A. White; Captain Thomas A. Smith; and Donald G. Rehkopf, Jr.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel Linell A. Letendre; Lieutenant Colonel C. Taylor Smith; Major Scott C. Jansen; Major Rhea A. Lagano; and Gerald R. Bruce, Esquire.

Before

ROAN, MARKSTEINER, and WIEDIE
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

MARKSTEINER, Judge:

The appellant was convicted, contrary to his pleas, by a panel of officers of one specification of attempted murder, two specifications of aggravated assault, and one specification of assault with intent to commit murder under Articles 80, 118, and 134, UCMJ, 10 U.S.C. §§ 880, 918, 934. He was sentenced to a dishonorable discharge,

confinement for 11 years, forfeiture of all pay and allowances, and reduction to E-1.[1] Excepting the forfeitures, the convening authority approved the sentence as adjudged.[2]

The appellant initially assigned six errors: (1) Whether Specification 2 of Charge II is a lesser included offense (LIO) of Specification 1 of Charge II; (2) Whether Charges II and III are LIOs of Charge I and are thereby multiplicious with Charge I; (3) Whether the military judge abused her discretion by failing to find Charges II and III unreasonably multiplicious for findings; (4) Whether the Specification of Charge III failed to state an offense; (5) Whether the evidence was legally and factually sufficient; and (6) Whether the military judge erroneously instructed the members that the appellant would receive credit for good time served. We also address as supplemental assignments of error the following issues:[3] (7) Whether trial defense counsel committed fraud on the court-martial, when they represented that they were qualified and certified to defend the appellant, because they were not sufficiently prepared – ergo not qualified – to try the case; (8) Whether the Government's failure to comply with discovery and *Brady*[4] obligations contributed to fraud on the court-martial; (9) Whether trial defense counsel provided constitutionally ineffective assistance, as articulated in 23 separately alleged errors; and (10) Whether a new trial is warranted because newly discovered evidence disproves that the appellant had the requisite mens rea required to be found guilty of attempted unpremeditated murder.

For the reasons articulated below, Charges II and III are dismissed. We deny the appellant's request for appellate discovery and a new trial.[5] The remaining findings and sentence, as reassessed, are affirmed.[6]

---

[1] The charges and specifications were merged for sentencing purposes.

[2] The convening authority waived the mandatory forfeitures, directing they be paid to the appellant's spouse.

[3] On 4 September 2013, the appellant filed a Motion for Appropriate Relief requesting that we consider the matters raised in his Petition for a New Trial as supplemental assignments of error under *United States v. Luke*, 69 M.J. 309 (C.A.A.F. 2011).

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] On 11 March 2013, the appellant, through his then-newly-retained civilian appellate defense counsel and his originally assigned military appellate defense counsel, petitioned for a new trial and moved to attach various documents to the record of trial, citing "fraud on the court" and "newly discovered evidence" under Rule for Courts-Martial (R.C.M.) 1012(c). On 26 March 2013, he filed a Motion for Appropriate Relief requesting (1) appellate discovery of various documents and/or records, and (2) the replacement of various pages in his copy of the record of trial that were either missing entirely, or that were otherwise unclear or illegible.

[6] The appellant asked this Court to order the Government to provide his civilian appellate defense counsel with copies and/or duplicates of certain materials that he purports were removed from the copy of the record of trial provided to him in confinement. In his 12 April 2013 Reply, the appellant noted that his civilian appellate defense counsel had "sought relief in the form of an unredacted trial transcript [and that] a digital version has been provided to civilian appellate defense counsel, mooting that specific request." To the extent his request for relief in the form of a complete record of trial is not rendered moot by this decision, he is free to seek relief from this Court if his civilian counsel is unable to gain access to any portion of the record in this case to which he is entitled under our Rules of Practice and Procedure.

*Background*

The charges stemmed from the appellant's shooting of JEH. In late July 2009, the appellant and his wife travelled from Charleston Air Force Base (AFB), South Carolina, to visit family and to attend the funeral of the appellant's grandmother. Prior to this visit, there had arisen considerable acrimony between his family and friends and JEH's family and friends. The dispute regarded ZS, the appellant's sister's boyfriend, who had previously dated JEH's relative. The appellant testified that TG, the husband of JEH's cousin, had threatened ZS.

On the morning of 26 July 2009, JEH smoked methamphetamine, watched television, then around noon went outside into his yard to repair his truck. An acquaintance who was assisting him noticed a white sedan driving slowly back and forth in front of JEH's home. As JEH walked out to the road and approached the vehicle, which was being driven by the appellant, the appellant asked JEH where TG lived. JEH used profanity and told the appellant that he (appellant) would have to go through him (JEH) to get to TG, or words substantially to that effect. As JEH walked alongside the appellant's slowly moving car, the two began to argue. At some point the appellant brandished a pistol. When the argument became heated, the appellant started to drive off, and JEH threw a wrench he had been carrying, striking the appellant's car. The appellant then stopped the car and fired a handgun from inside the vehicle. The bullet struck JEH in the back as he was running away.

Investigator GP responded to the call regarding the shooting, interviewed JEH, and gathered evidence, including a .40 caliber spent cartridge and a 9/16th inch wrench. His investigation led him to the home of the appellant's in-laws, where he questioned the appellant about the shooting. The appellant denied any involvement and denied ever being on Highway 77 at all that day. Investigator GP specifically provided an opportunity for the appellant to offer information about whether he may have shot the victim in self-defense, but the appellant continued to deny any involvement. When asked if he had any weapons, the appellant directed Investigator GP to his car, where the detective retrieved the appellant's .40 caliber Glock pistol and a .38 caliber revolver.

The appellant essentially testified that the shooting was an accident motivated by self-defense, saying that when he asked JEH about TG, JEH became extremely belligerent, lunged at his car and threw something the appellant thought was a knife. Approximately 2 or 3 seconds after the appellant "slammed on the gas and floored it," he heard a loud bang from something striking the back of his car, at which point he stopped, pointed the gun over his left shoulder out the driver side window, "and fired one shot into the air. . . . to keep him away from me because I was scared." The crux of trial defense counsel's findings argument was that the appellant's account was more believable than that of the meth-using JEH, and that the appellant lacked the requisite criminal intent.

*Lesser Included Offenses*

The appellant avers that Specification 2 of Charge II is an LIO of Specification 1 of Charge II, and that Charges II and III are a LIOs of Charge I.[7]

At trial, the parties agreed that all charges and specifications arose from the same set of facts: the appellant's shooting of JEH. The Specification of Charge I alleged that the appellant attempted to murder JEH by shooting him with a loaded firearm, in violation of Article 80, UCMJ. Charge II alleged two violations of Article 128, UCMJ: Specification 1 alleged the appellant committed an aggravated assaulted upon JEH by shooting him in the back with a loaded firearm, intentionally inflicting grievous bodily harm – a deep abdominal wound; Specification 2 alleged the appellant assaulted JEH by shooting him with a dangerous weapon – a loaded firearm. The Specification of Charge III alleged the appellant assaulted JEH with the intent to murder him, by shooting him with a loaded firearm, in violation of Article 134, UCMJ.

We need not dissect the elements of the two specifications of Charge II because both allege – based on the same conduct – aggravated assault under Article 128, UCMJ. Furthermore, as the Government acknowledges, aggravated assault is a well-recognized LIO of attempted murder. *See, e.g.*, *United States v. Kreutzer*, 70 M.J. 444, 445 (C.A.A.F. 2012); *United States v. Dacus*, 66 M.J. 235 (C.A.A.F. 2008). If an LIO is separately pled in addition to the greater offense, an accused may not be convicted of both the greater and the lesser offenses. *United States v. Hudson*, 59 M.J. 357 (C.A.A.F. 2004), *rev'd on other grounds*; *United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2010). Accordingly, Charge II is dismissed.[8]

*Failure to State an Offense – Charge III*

The appellant argues that Charge III, and its Specification, should be set aside because it fails to allege any of the terminal elements required under Article 134, UCMJ.

Whether a charge and specification state an offense and the remedy for their failure to do so are questions of law that we review de novo. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012). Because the appellant did not complain about the missing element at trial, we analyze for plain error and, in doing so, find that the failure here was "plain and obvious error that was forfeited rather than waived." *United States v. Humphries*, 71 M.J. 209, 211 (C.A.A.F. 2012). The remedy, if any, depends on "whether the defective specification resulted in material prejudice to [the appellant]'s substantial right to notice." *Id.* at 215 (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a)). The prejudice analysis of a defective specification under plain error requires close review of

_____

[7] As we ultimately dismiss Charge III for failing to allege a terminal element, we need not address here whether Charge III is a lesser included offense of Charge I.
[8] The military judge granted the defense's motion to merge the offenses for sentencing purposes.

the record: "Mindful that in the plain error context the defective specification alone is insufficient to constitute substantial prejudice to a material right, we look to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted.'" *Id*. at 215-16. (citations omitted).

The theme of the Government's case focused on the attempted murder alleged in Charge I. As in *Humphries*, the Government counsel never: (1) mentioned how the appellant's conduct satisfied either Clause 1 or 2 of the terminal element of Article 134, UCMJ; (2) presented any evidence or called a witness to testify on either or both clauses; (3) made any attempt to tie evidence or witness statements to either or both clauses;[9] or (4) mentioned the terminal element at any point during closing argument on findings. *See Humphries*, 71 M.J. 209. Having examined the record, we find that notice of the missing element was neither extant in the trial record nor essentially uncontroverted. Accordingly, the Government's failure to separately charge and prove the terminal element materially prejudiced the appellant's substantial right to constitutionally required notice. *See id.* at 215. Charge III is therefore dismissed.[10]

*Legal and Factual Sufficiency*

The appellant argues the evidence is legally and factually insufficient to support his conviction of attempted unpremeditated murder. He essentially attacks the mens rea element, arguing that, when JEH struck the appellant's car with a wrench as the appellant was driving away, JEH provoked the appellant to fire his weapon, which rendered the evidence sufficient to prove, at most, attempted voluntary manslaughter and assault with intent to commit voluntary manslaughter. We disagree.

We review legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "'whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). "The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citing *Turner*, 25 M.J. at 325).

---

[9] Investigator GP answered affirmatively when asked by the assistant trial counsel, "[w]hen you learned an Air Force member was involved in the shooting, were you surprised?" When asked to explain why he was surprised, he responded "he said he was a cop like me and he would have understood not to be put in this situation." While this passage does reference the appellant's status as an Air Force member, the reference was not made in a context connecting it to a terminal element of Article 134, UCMJ, 10 U.S.C. § 934.

[10] Having done so, we need not address the appellant's preemption argument as to Charge III.

The elements of the offense of attempted unpremeditated murder are: (1) the appellant did a certain overt act (in this case, shot JEH with a loaded firearm); (2) the act was done with the specific intent to commit unpremeditated murder; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to bring about the commission of the offense. As noted, the appellant specifically challenges the sufficiency of proof of the second element. *See Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶¶ 4.b., 43.b.(3) (2008 ed.).

"An unlawful killing without premeditation is also murder when the accused had either an intent to kill or inflict great bodily harm. It may be inferred that a person intends the natural and probable consequences of an act purposely done. Hence, if a person does an intentional act likely to result in death or great bodily injury, it may be inferred that death or great bodily injury was intended. The intent need not be directed toward the person killed, or exist for any particular time before commission of the act, or have previously existed at all. It is sufficient that it existed at the time of the act or omission." *MCM*, Part VI, ¶ 43.c.(3).

However, "[a]n unlawful killing, although done with an intent to kill or inflict great bodily harm, is not murder but voluntary manslaughter if committed in the heat of sudden passion caused by adequate provocation." *MCM*, Part IV, ¶ 44.c.(1)(a); *see* also Article 119(a), UCMJ, 10 U.S.C. § 919(a); *United States v. Schap*, 49 M.J. 317, 321 (C.A.A.F. 1998). "The provocation must be adequate to excite uncontrollable passion in a reasonable person, and the act of killing must be committed under and because of the passion." *MCM*, Part IV, ¶ 44.c.(1)(b); *see also United States v. Roukis*, 60 M.J. 925 (Army Ct. Crim. App. 2005) (internal signals and quotation marks omitted).

"Self-defense [] requires more than provocation and fear. Self-defense applies only if it was reasonable for appellant to have feared 'that death or grievous bodily harm was about to be inflicted wrongfully on [him],' and if he believed that the force used was necessary to protect against that death or grievous bodily harm." *United States v. Saulsberry*, 47 M.J. 493 (C.A.A.F. 1998) (second alteration in original) (citing Rule for Courts-Martial (R.C.M.) 916(e)(1)).

We find the evidence legally and factually sufficient to support the finding of attempted unpremeditated murder.

The evidence supports the members' apparent conclusion that the appellant was not acting in self-defense or provoked into a heat of sudden passion such that the grievously wounding shot was fired before self-control could return. Any provocation by JEH was insufficient to excite uncontrollable passion in a reasonable person under these circumstances. *See MCM*, Part IV, ¶ 44.c.(1)(a); *United States v. Henderson*, 48 M.J. 616 (Army Ct. Crim. App. 1998) (no provocation where appellant stabbed other

participant numerous times in mutual affray), *aff'd*, 52 M.J. 14 (C.A.A.F. 1999); *Cf. United States v. Levell*, 43 M.J. 847, 853 (N.M. Ct. Crim. App. 1996) (upholding premeditated murder conviction where movements leading up to a killing occurred in several seconds).

First, the appellant specifically sought out and instigated the confrontation when he drove to JEH's house to locate TG because TG had threatened his sister's boyfriend. Second, he did so while well-armed with two loaded handguns. Third, he was at all times during the confrontation safely within his car and able to simply leave, while JEH was walking several feet away along the roadside. Fourth, his suggestion that after he accelerated away from JEH for 2-to-3 seconds, he blindly fired over his shoulder and still managed to strike JEH center of mass, in the middle of his back, simply strains credibility. Fifth, and perhaps most tellingly, even according to the appellant's account, he didn't fire his weapon as JEH was purportedly lunging toward his vehicle; rather he sped away for 2-to-3 seconds, then stopped the car and fired his weapon. Specifically, he testified, "as soon as [JEH] lunged I slammed on the gas, it wasn't 2-to-3 seconds later I slammed on the brakes because something hit the back window of my vehicle." A member's question suggests the panel shared our skepticism at the appellant's proffered self-defense theory. The member asked: "You testified that you stepped on the gas after [JEH] lunged at you from 6 feet away and moments later you heard a noise that sounded like the back window shattered. If you were truly scared for your life, and knew that the alleged assailant, [JEH], was on foot why would you stop your car as opposed to continuing to step on the gas as there was no way he could catch you?"

Having considered the evidence in the light most favorable to the prosecution, we find that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of attempted unpremeditated murder. Having further weighed the evidence in the record of trial, making allowances for not having personally observed the witnesses, and applying our fact-finding powers under Article 66, UCMJ, we are convinced of the appellant's guilt beyond a reasonable doubt. Accordingly, we find sufficient evidence to affirm his conviction of attempted unpremeditated murder.

*Instructions on Confinement Credit*

The appellant argues that the military judge's explanation of "good time," in response to a member's question, was error meriting a one-year reduction of his confinement, or the return of his case for a new presentencing proceeding. We disagree.

Roughly an hour and a half after the members began deliberating on sentence, the military judge reopened the court to answer their questions. One member asked, "as part of rehabilitation is there time off for good behavior in confinement, i.e., a reduced term. If so, how much is it reduced, such as one-third, one-fourth etc." Though the military judge explained that "good time" was awarded according to a fixed formula, depending

on a confinee's conduct, she nevertheless cautioned "that is not really before you to consider or factor into your sentence. The purpose here is to determine what you each individually believe and then collectively believe is the appropriate sentence for this case based on your findings."[11]  As our superior court has instructed:

> Although military judges and members should not generally consider collateral consequences in assessing a sentence, this is not a bright-line rule. In certain circumstances, therefore, it may be appropriate for the military judge to instruct on collateral matters. In deciding whether the military judge erred in giving such instructions, we will take a flexible approach focusing on the military judge's responsibility to give "legally correct instructions that are tailored to the facts and circumstances of the case." For example, the "availability of parole and rehabilitation programs are issues of general knowledge and concern, and as such they may be instructed upon, especially when requested by the members." However, in such a situation, the military judge should then instruct the members that although the possibility of parole exists in the military justice system, "they could not consider it in arriving at an appropriate sentence for [the] appellant."

*United States v. McNutt*, 62 M.J. 16, 19 (C.A.A.F. 2005) (alteration in original) (citations omitted); *see also United States v. Duncan*, 53 M.J. 494, 499 (C.A.A.F. 2000)(not error for trial judge to explain parole process where his instructions also made clear the members were to "do what you think is right today. . . . [and] not be concerned about the impact of parole.")

Even assuming any error in the military judge's instruction, we find such error clearly harmless. *See* Article 59(a), UCMJ; *see also Duncan*, 53 M.J. at 499-500. As in *Duncan*, the members themselves interrupted their deliberations to inquire about the possibility of good time[12] and the existence of rehabilitation programs. Likewise, the inquiry was reasonable given the nature of the appellant's crime and the issue of his rehabilitative potential. Finally, and also as in *Duncan*, the military judge in this case correctly instructed the members that although the principle of "good time" existed in the military justice system, they should not consider it in arriving at an appropriate sentence for the appellant. Accordingly, we conclude that these instructions, even if erroneous, did not materially prejudice any of the appellant's substantial rights.

*Assistance of Counsel*

---

[11] The military judge used similar language in two other sections of the relatively brief exchange about "good time" to instruct the members they were to adjudge a sentence they believed appropriate, without reference to potential collateral matters such as good time.

[12] In *United States v. Duncan*, 53 M.J. 494, 499 (C.A.A.F. 2000), the inquiry was specifically about "parole."

The appellant has averred 23 separate transactions he describes as examples of ineffective assistance of counsel. As we have decided to consider those allegations as supplemental assignments of error, we now evaluate his claim under Article 66(c), UCMJ, 10 U.S.C. § 866(c). Having carefully reviewed and analyzed appellate defense counsel's veritable catalogue of alleged insufficiencies, and in light of the totality of facts and circumstances before us, we find no substantive merit in the appellant's allegations of ineffective assistance of counsel. Article 66(c), UCMJ.

We review ineffective assistance of counsel claims de novo. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001).

The Sixth Amendment[13] entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Our inquiry into an attorney's representation must be "highly deferential" to the attorney's performance and employ "a strong presumption" that counsel's conduct falls within the wide range of professionally competent assistance." *Id*. at 688-89. Our superior court has applied this standard to military courts-martial, noting that, "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S.Ct. 770 (2011).

We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. In making that determination, we consider the totality of the circumstances, bear in mind "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work . . . [and] recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. "The appellant bears the heavy burden of establishing that his trial defense counsel were ineffective." *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004). "There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as the Court in *Strickland*] or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001) (quoting *Strickland*, 466 U.S. at 697). When making the two-part inquiry into the reasonableness of counsel's conduct and whether prejudice resulted, we note that "in many cases review of the record itself is sufficient," *United States v. Lewis*, 42 M.J. 1, 3 (C.A.A.F. 1995), to resolve the appellant's claims of ineffectiveness.

---

[13] U.S. CONST. amend VI.

Although appellate courts "are normally precluded from consideration of the allied papers in our review of a case, we may consider such evidence and other matters outside the record where the question of effectiveness of counsel is concerned." *United States v. Davis*, 3 M.J. 430, 431 n.1 (C.M.A. 1977) (citations omitted).

## 1. *Failure to challenge the attempted murder Specification for failing to state an offense*

The appellant avers his trial defense counsel should have challenged the attempted murder Specification as it did not allege a specific intent, thus depriving him of his due process right to notice. We disagree.

Whether a specification is defective and the remedy for such error are questions of law which we review de novo. *United States v. Norwood*, 71 M.J. 204 (C.A.A.F. 2012). "[I]n order to state the elements of an inchoate offense under Articles 80 and 81, UCMJ, a specification is not required to expressly allege each element of the predicate offense." *Id.* at 205. "A charge and specification are sufficient if they, first, contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend, and, second, enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . . A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." *Id.* at 205, 212 (citations omitted); R.C.M. 307(c)(3).

An intent to kill or inflict great bodily harm is a definitional component of murder under Article 118, UCMJ, and therefore alleged in the charge by necessary implication. Moreover, the record contradicts any suggestion that the appellant was ever in doubt about the specific intent element of the crime with which he was charged. On the contrary, it appears to have been the centerpiece in the defense theory of the case at the trial level. Accordingly, we do not find trial defense counsel's failure to raise this issue to constitute professional behavior falling below an objective standard of reasonableness in light of prevailing professional norms. *Strickland*, 466 U.S. 668.

## 2. *Unfamiliarity with medical evidence*

The appellant next avers that his trial defense counsel failed to familiarize themselves with the medical evidence, and thus failed to recognize a challenge to the allegation in Specification 1 of Charge II that JEH suffered a "deep abdominal wound," when in fact, according to the appellant, JEH had no abdominal wounds. We find this claim without merit.

As Dr. TK explained, after the bullet struck bone upon entering JEH, it broke into several fragments that came to rest in various areas defined medically as falling within his thoraco-abdominal region. Accordingly, we do not find trial defense counsel's failure to address what appellate defense counsel appear to suggest is a material

distinction between the terms "thoraco-abdominal region" and "abdominal" as a representational error falling below an objective standard of reasonableness in light of prevailing professional norms at the time the case was tried. *Strickland*, 466 U.S. 668.

3. *Failure to challenge the Article 134, UCMJ, offense for failing to allege a terminal element*

The appellant's case was tried in November and December of 2010, eight months before our superior court issued its decision in *United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011). It can hardly be said that the holding in *Fosler* was a widely anticipated step in the evolution of military criminal law. At least one judge observed that the Fosler majority's decision "whistle[s] past sixty years of precedent and many more of continuous and consistent practice." *Id*. at 242 (Baker J., dissenting). We therefore do not find trial defense counsel's failure to challenge the Article 134, UCMJ, Charge and Specification for omitting the terminal element to constitute ineffective assistance of counsel. *Strickland*, 466 U.S. 668. Moreover, because we have dismissed the Charge and Specification pursuant to *Humphries*, the appellant has suffered no prejudice by his counsel's failure to object. *Id*.

4. *Failure to seek investigative assistance*

The appellant asserts that "a defense investigator could have done what defense counsel apparently did not have time to do or did not think of doing" – interviewed the surgeon who operated on JEH; obtained certificates of conviction for JEH's three felony convictions (and ascertained if he also had misdemeanor convictions) and what the sentences were; and investigated JEH's propensity and reputation for violence (one of his convictions was for Assault in the 2nd Degree, according to the appellant, a class "C" felony in Alabama). The appellant argues that "[w]ithout knowing the sentence [JEH] received for his felony . . . conviction, it was impossible for [trial] defense counsel to ascertain (a) whether or not such fell within or without the presumptive 10 year rule in [Mil. R. Evid.] 609(b); (b) the circumstances and nature of the underlying assault that he was convicted of; and (c) made it impossible for defense counsel to articulate why the conviction was relevant under the Rule's balancing test if the 10 year period had expired."

The appellant articulates a reasonable litigation strategy or tactic that trial defense counsel could have potentially exploited, depending on what such an investigation ultimately uncovered. However, even if we were to assume that the failure to investigate such matters constituted ineffective assistance under the first prong of the *Strickland* analysis, the appellant fails to demonstrate prejudice under the second prong. It is simply not enough to speculate that additional investigation *could have* impacted the outcome of appellant's case at the trial level. The test for prejudice on a claim of ineffective assistance of counsel is whether "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S.Ct. 770. Accordingly, we decline to find this example of trial defense counsels' assistance to have been ineffective. *See id.* at 668; *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001).

*5. Failure to recognize and assert the appellant's four days of civilian pretrial confinement and two days of restriction*

Because we may correct this error now on appeal by reducing the appellant's confinement by the number of days for which he failed to receive credit at trial, we decline to find any prejudice and therefore decline to find this example of trial defense counsels' assistance to have been ineffective. *See Strickland*, 466 U.S. 668; *McConnell*, 55 M.J. 479.

*6. Failure to object to "mendacity" instruction*

The appellant argues "there is no evidence that [he] had lied during his testimony on the merits nor did the Government argue such. The fact that [the appellant]'s perceptions and recollections differed from the only other eyewitness, a thrice convicted felon addicted to methamphetamines, does not rise to the level of mendacity."

A mendacity instruction "is normally reserved for cases where it can be inferred from the evidence that an accused testified falsely before the members while under oath, or trial counsel argues that an accused did so." *United States v. Smith*, 25 M.J. 785 (A.C.M.R. 1988).

The primary contested issue at trial turned on the differing versions of the facts presented by the appellant and JEH. Both agreed that they exchanged heated words sometime after JEH approached the appellant's car. However, their versions of the sequence of events happening thereafter diverge. The appellant said JEH lunged at his car and threw something the appellant thought to be a knife, at which point the appellant accelerated away until he heard a loud noise, then stopped the car and fired blindly over his shoulder because he was in fear for his life. JEH said after the appellant brandished a large black pistol and began to drive away, he threw a wrench that struck the car, whereupon the appellant stopped the car, leaned out the window, and shot JEH in the back as he was running away.

Trial counsel made a spirited closing argument, the unmistakable substance of which was that the appellant had testified falsely about a number of important facts. This was not a case like *United States v. Warren*, 13 M.J. 278 (C.M.A. 1982), where the substance of the conflicting testimony and trial counsel's argument focused on "falsehoods [that] were of no real importance . . . [or] only reflect[ed] [the appellant's]

hedging somewhat on a minor point about which he could not bring himself to be entirely frank." *Id.* at 286. Rather, the inconsistencies in the appellant's testimony were unmistakably argued by the Government to have been "willful and material." *Id.*[14]

Following closing arguments, the members found the appellant guilty, by clear implication believing JEH's version and disbelieving the appellant's. Under these circumstances, and in light of the wide latitude accorded trial judges when crafting instructions, *see e.g.*, *United States v. Thomas*, 43 M.J. 626, 639 (A.F. Ct. Crim. App. 1995), we do not find that trial defense counsel's failure to object to the mendacity instruction amounted to a representational error falling below an objective standard of reasonableness in light of prevailing professional norms, at that time the case was tried. *See Strickland*, 466 U.S. 668.

### 7. *Failure to object to "duty to retreat" arguments and instruction*

The appellant further argues his trial defense counsel should have objected to the trial counsels repeated arguments as well as the military judge's instruction regarding the appellant's failure to retreat because he had no duty to retreat as a matter of law under the factual circumstances. Citing Article 36, UCMJ, 10 U.S.C. § 836, *Brown v. United States*, 256 U.S. 335 (1921), and *Beard v. United States*, 158 U.S. 550 (1895), the appellant argues he "was in his vehicle on a public road where he had every right to be [and therefore] had no duty to retreat." In light of the facts of this case, we do not find *Brown* or *Beard* to support the argument the appellant makes.

Although the two cases the appellant cites do establish a person's general right to "stand his ground" under certain circumstances, they are distinguishable from the case at bar in a number of important respects. Brown was at work where he was required to be when he was attacked. Beard was on his own property. Neither of them sought out their victims. Neither of them instigated the confrontations. And, neither of them was safely insulated from his attacker inside a steel enclosure capable of almost instantly outpacing even the most determined on-foot assailant, at the time they brought deadly force to bear.

The precedent, as articulated by Justice Holmes in *Brown*, is that "[r]ationally the failure to retreat is *a circumstance to be considered with all the others* in order to determine whether the defendant went farther than he was justified in doing; not a

---

[14] Specifically, in closing, trial counsel argued: "[H]e brought his vehicle to a stop, grabbed his loaded .40 caliber weapon with hollow point bullets, stuck it out the window, and took aim. That caused [JEH] to turn around and start running back to his house. Then the accused intentionally and deliberately pulled the trigger of that gun. . . . [T]he accused's version is bizarre on so many levels. I don't want to sound unduly harsh, critical or offensive but in many respects it just lacks common sense. Yesterday he claimed that he made the Hail Mary of shots. When the vehicle stopped, he just for whatever reason threw his weapon behind him and[sic] the victim 20 yards behind him and just happened to shoot him the middle of the back. The accused got up on the stand and he's claiming that he was the victim, that [JEH] was attacking him but who showed up with a loaded gun in the first place. . . . He expects you to believe . . . ."

categorical proof of guilt." *Id.* (emphasis added). Notably, that very principle was squarely included in the charge the trial judge gave the jury in the appellant's case: "A person may stand his ground when he is at a place at which he has a right to be. Evidence tending to show that the accused had an opportunity to withdraw safely is *a factor* which should be considered along with all other circumstances in deciding the issue of self-defense." Applying the legal principles highlighted in the cases to which the appellant invites our attention to the facts of the case now before us, we find the appellant's use of potentially deadly force was therefore unlawful.

The instruction the military judge gave the members in the appellant's case was also in substantial conformity with the *Manual's* guidance on the extent to which opportunity to retreat should be considered in the context of self-defense. *See* R.C.M. 916(e)(4), Discussion; *see also United States v. Behenna*, 71 M.J. 228, 236 (C.A.A.F. 2012) (finding "especially" relevant the fact that Behenna "had every opportunity to withdraw from the confrontation and there was no evidence he either attempted or was unable to do so," where he was initial aggressor).

We reject the appellant's assertion that trial defense counsel's failure to object to the military judge's instructions on the appellant's ability to retreat, which – not incidentally for purposes of the *Strickland* analysis – tracked the Department of the Army Pamphlet 27-9 (hereinafter Benchbook), amounted to a representational error falling below an objective standard of reasonableness in light of prevailing professional norms, at that time the case was tried. *See Strickland*, 466 U.S. 668. Likewise, we reject his related assertion that his counsel's failure to object to trial counsel's comments on his ability to retreat amounted to ineffective assistance. *Id.*

*8. Failure to recognize exhibit's relevance and rebuttal effect*

Trial defense counsel objected on relevance grounds to the admission of Prosecution Exhibit 14, the appellant's small arms training record, which showed the appellant met minimal qualification standards with an M9 pistol and met expert qualification standards with the M-4 and M-16. The appellant now argues that his trial defense counsel essentially misunderstood what the training record established about the appellant's shooting ability with a pistol, and that such misunderstanding prevented them from objecting to the trial counsel's mischaracterization of the appellant as a "good shot." More particularly, the appellant argues that while he qualified with the pistol, he did so only minimally. Accordingly, he asserts, trial counsel perpetuated fraud on the court when they argued that the appellant was a "good shot" with a pistol, and that his trial defense counsel evinced professional ineffectiveness by failing to understand, and failing to object to, the inaccuracy of trial counsel's characterization of him as a "good shot."

The appellant was a security forces member who was trained and qualified on the use of firearms. The one and only shot he fired out the window of his vehicle after

placing some distance between himself and JEH struck JEH center of mass as he was running away. On these facts we reject the proposition that trial defense counsels' failure to object to trial counsel's characterization of the appellant as a "good shot" amounted to ineffectiveness. *Strickland*, 466 U.S. 668.

### 9. Failure to seek R.C.M. 917 relief

On cross examination, JEH testified that he may have provoked the appellant prior to the shooting. The appellant now argues that his trial defense counsel was ineffective because he did not seize upon that admission and move the trial court to find him not guilty under R.C.M. 917 based on insufficient showing of premeditation to support the attempted murder charge.

"Under R.C.M. 917(a), the military judge 'shall enter a finding of not guilty . . . if the evidence is insufficient to sustain a conviction of the offense affected.'" *United States v. Parker*, 59 M.J. 195, 200 (C.A.A.F. 2003) (omission in original). Further, "R.C.M. 917(d) states that a motion for a finding of not guilty 'shall be granted only in the absence of some evidence which, together with all reasonable inferences and applicable presumptions, could reasonably tend to establish every essential element of an offense charged. The evidence shall be viewed in the light most favorable to the prosecution without an evaluation of the credibility of witnesses.'" *Id.*

During the Government's case in chief, witnesses testified: (a) On 26 July 2009 the appellant drove to JEH's house intending to identify the individual who had been involved in an altercation with his family's friend; (b) he brought two loaded handguns with him; (c) upon arriving at JEH's residence, he repeatedly drove back and forth in front of his house until JEH approached his car; (d) after JEH made contact with him, the appellant brandished the handgun with which he later shot JEH, and communicated to JEH a threat about TG, the husband of JEH's cousin; (e) after exchanging heated words as the appellant was driving away, JEH threw a wrench that struck the appellant's vehicle; (f) after the wrench struck the appellant's vehicle, the appellant stopped, leaned out of the vehicle's driver side window, and shot JEH in the back as JEH was running away; (g) after shooting JEH and watching him fall, the appellant, himself a law enforcement officer, fled the scene; and (h) when questioned by Investigator GP about the incident, the appellant denied any involvement whatsoever in the shooting.

Viewing this evidence in light of R.C.M. 917 and our superior court's guidance as articulated *Parker*, we do not find trial defense counsel's failure to make a motion for finding of not guilty under R.C.M. 917, either at the close of evidence or following trial counsel's closing argument, to amount to ineffectiveness. *See Strickland*, 466 U.S. 668.

*10. Failure to raise self-defense during voir dire*

Trial defense counsel did not mention self-defense during voir dire or in opening statement. Accordingly, the appellant now argues, "the members had no idea from the beginning that it was both a relevant and important concept that would have an important role in the defense (or at least should have)."

Even if we were to conclude that trial counsel's failure to mention self-defense during voir dire or their opening statement constituted ineffective assistance, we reject any assertion that such omission was prejudicial to the appellant, particularly in light of the extent to which self-defense was an ever present – even if not specifically stated – theme in the defense's case, and was a thoroughly argued issue in closing by both sides. Accordingly, having found no prejudice, we therefore decline to find this example of trial defense counsels' assistance to have been ineffective. *See Strickland*, 466 U.S. 668; *Harrington*, 131 S.Ct. 770; *McConnell*, 55 M.J. 479.

*11. Failure to assert the appellant's deployment as relevant to self-defense*

The appellant contends that trial defense counsel failed to understand, and thus did not advocate that his recent deployment to an active combat zone was, at minimum, relevant to the subjective prong of self-defense.

At trial, following the appellant's testimony on the merits, a jury member asked several questions about his recent deployment, including: "(1) When did you return back stateside from your deployment to Afghanistan;" (2) "What duties did you perform while on that deployment;" (3) "Were you exposed to any troops in contact events while deployed;" and (4) "Do you feel the events you encountered during your deployment in any way affected your actions / reactions on 26 July 09?" Trial counsel objected to the questions, noting "[t]o the extent it's relevant at all it may be relevant in sentencing, but to the extent that there's – it also raises mental capacity issues, which were never pled as an affirmative defense at this point." Trial defense counsel declined to offer responsive argument, and the military judge found the questions irrelevant.

The appellant submitted the post-trial affidavits of his mother and his wife describing his behavioral changes after his return from the eight-month deployment. They described him as being standoffish, anxious and easily agitated, having bad dreams and experiencing sleep disturbances, and feeling vulnerable in front of windows or in crowds or unlocked rooms. His wife attested that she believed "that all this [referring to the shooting] occurred because he felt threatened and scared."

"It is a defense to a homicide, assault involving deadly force, or battery involving deadly force that the accused: (A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and

(B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm." R.C.M. 916(e). Further, "[r]elevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil. R. Evid. 401.

At first blush, it would appear reasonable to question why the appellant's trial defense counsel would have conceded that the questions were not relevant. It is not unheard of for military members to have encountered deployment situations that could impact the subjective level of apprehension they may feel in potentially dangerous situations following their deployments. That fact, together with the affidavits submitted here could, in isolation, raise a concern regarding trial defense counsels' failure to advocate the relevance of his deployment in response to the member's question. However, under the present facts, considering the totality of the information in the record before us, such a concern would be unwarranted.

There is little support in the record before us to find the assertions submitted on the appellant's behalf persuasively neutral, objective, or reliable. Rather, every indicator before us suggests the contrary. The feud between the appellant's family and JEH and his circle of family and friends had been going on for some time and was quite volatile.[15] The Article 32, UCMJ, investigation found that "[w]hile all necessary witnesses will likely be made available upon issuance of a subpoena, . . . most of the witnesses in this case refused to testify at the Article 32 hearing and will likely be uncooperative at trial. This includes [JEH], the parents and sister of the accused and his wife." *See Davis*, 3 M.J. at 431 (appellate courts may consider allied papers where the question of effectiveness of counsel is concerned) (citations omitted).

Moreover, even if we were to conclude the post-trial affidavits were sufficient to raise a question about the actions of trial defense counsel with respect to this allegation of ineffective assistance, we would nevertheless find no prejudice. Against the contextual backdrop of this case, as amply laid out in other portions of this opinion, although it is conceivable that information about the appellant's experiences during his deployment may have, based on the right evidence, led to a different outcome in his case, the standard is not mere conceivability. Rather, "[t]he likelihood of a different result must be substantial." *Harrington*, 131 S.Ct. at 770. Accordingly, we decline to find this example of trial defense counsels' assistance to have been ineffective. *Strickland*, 466 U.S. 668; *McConnell*, 55 M.J. 479.

12. *Failure to call the appellant's father as a witness*

---

[15] During a previous confrontation between the parties, the appellant's father was alleged to have shot the tire of JEH's vehicle. The appellant's father admitted to having threatened JEH with the weapon, but denied shooting the tire.

The appellant argues that trial defense counsel were ineffective in not calling his father, Pastor Charles Wayne Miller, to testify in corroboration of the appellant's account of the events.

Pastor Miller was on the telephone with the appellant during the confrontation and shooting. The Article 32, UMCJ, investigating officer concluded that the "voice was audible to [Pastor Miller] via speakerphone just before the shot." In his sworn written statement to the Alabama authorities, Pastor Miller described what he heard:

> [The appellant asked] if [JEH] could tell him where [TG] lived. The other voice said Hell not I'm not telling you a fu_ _ ing thing, I am going to cut your f _ _ king guts out. Then [the appellant] said Daddy he's running after me, he's almost at my window. He's throwing the knife at the same time I heard a gunshot.

Though Pastor Miller's written statement potentially could have been corroborative, as the appellant suggests, other information in the record could just as easily be understood as reasonable bases counseling against calling him as a witness at trial. After hearing the shot over the speaker phone, Pastor Miller advised the appellant to flee the scene. Pastor Miller had, himself, previously threatened JEH with a firearm. Finally, Pastor Miller's written statement contained repugnant, racially-charged epithets which would almost certainly evoke a profoundly negative reaction from a military panel if the statement were to come before the members.

Consequently, we do not consider trial defense counsels' failure to call Pastor Miller to testify to constitute behavior falling below an objective standard of reasonableness in light of prevailing professional norms. *See Strickland*, 466 U.S. 668.

### 13. *Failure to object to reasonable doubt instructions*

The appellant argues that the reasonable doubt instruction provided by the military judge was erroneous, as evinced by the variance between the model Benchbook instruction and those given by the military judge in his case.

The military judge instructed the members:

> A "reasonable doubt" is a conscientious doubt, based upon reason and common sense, and arising from the state of the evidence. . . . "Proof beyond a reasonable doubt" is proof that leaves you firmly convinced of the accused's guilt.

There are very few things in the world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the accused is guilty of the offenses charged, you must find him guilty. If, on the other hand, you think that there is a real possibility that the accused is not guilty, you must give him the benefit of the doubt and you must find him not guilty.

The appellant argues that the given instruction watered down the Government's constitutional burden because, unlike the model instruction, it failed to charge the members that "the proof must rise to 'an evidentiary certainty.'" Additionally, he argues that the phrase "if you are 'firmly convinced' that the accused is guilty . . . you must find him guilty" returns the military reasonable doubt jurisprudence to the long-condemned "substantial doubt" era. Finally, he argues that the phrase "If . . . you think there is a real possibility that the accused is not guilty," considered in combination with the other flaws he identifies, "decreases the Government's burden while conversely, unconstitutionally increasing the burden on the accused." We disagree.

The military judge has substantial discretion in deciding which instructions to give, and we review his or her refusal to give a defense-requested instruction for an abuse of discretion. *United States v. Thomas*, 43 M.J. 626, 639 (A.F. Ct. Crim. App. 1995) (citations omitted). The very language the appellant now challenges, which was originally drafted by the Federal Judicial Center, has withstood appellate judicial scrutiny before us, our Navy colleagues, and our superior court. We find no reason to revisit those determinations here. *See id.*; *United States v. Meeks*, 41 M.J. 150 (C.M.A. 1994); *United States v. Jones*, 46 M.J. 815 (N.M. Ct. Crim. App. 1997).

The appellant is correct in his observation that the language used by the military judge does vary from the Benchbook's language. However, although the Benchbook language is the standard reasonable doubt instruction used in Army courts-martial, the language used by the military judge in the appellant's case is – and has been for many years – an accepted reasonable doubt instruction used in Air Force courts-martial. *See, e.g.*, *United States v. Sanchez*, 50 M.J. 506 (A.F. Ct. Crim. App. 1999).

Consequently, we do not consider trial defense counsels' failure to object to the reasonable doubt instruction given here to constitute behavior falling below an objective standard of reasonableness in light of prevailing professional norms at the time. *See Strickland*, 466 U.S. 668.

*14. Failure to employ scene reconstruction expertise*

The appellant suggests that a defense expert may have been able to offer an opinion contradicting those opinions provided by other witnesses as to the location of the

appellant and JEH at the time of the shooting. He articulates a reasonable potential litigation strategy or tactic trial defense counsel could have exploited, depending on what such an investigation uncovered. However, even if we were to assume that the failure to pursue such matters constituted ineffective assistance under *Strickland's* first prong, the appellant fails to demonstrate prejudice under the second prong. It is simply not enough to speculate that retaining a crime scene reconstruction specialist *could have* impacted the outcome of appellant's case at the trial level. The test is not whether a different outcome is merely conceivable, but whether the likelihood of a different outcome is substantial. *Harrington*, 131 S.Ct. 770. Accordingly, we find this issue meritless.

### 15. *Failure to attempt to impeach JEH*

First, the appellant avers that "[a]side from [JEH's] felony Assault 2nd conviction, he also had two convictions for Receiving Stolen Property, crimes arguably falling within the parameters of *crimen falsi* due to the dishonesty involved." (Emphasis in original). The appellant references "three prior felony convictions" without identifying any source or citation, and without providing any information about such convictions other than his own averments, which do not, standing alone, constitute evidence. *See e.g.*, *United States v. Lewis*, 42 M.J. 1, 3 (C.A.A.F. 1995). Accordingly, he provides insufficient information upon which we may assess whether such convictions would or would not have been admissible under the Military Rules of Evidence. We therefore have no basis upon which to conclude that trial defense counsel's failure to attempt to impeach JEH with prior convictions amounted ineffectiveness. *See Strickland*, 466 U.S. 668.

Second, we find the appellant's assertion that JEH's refusal to testify under oath at the Article 32, UCMJ, hearing "should have been fair game for cross examination," to be a non sequitur. Without more, we simply have no basis upon which to conclude that cross examining JEH about his disinclination to testify under oath at the hearing would have been helpful to the appellant's case at trial. We therefore find the appellant's argument with regard to this example of trial defense counsels' performance to be without merit. *See Strickland*, 466 U.S. 668.

Third, as we have found no error in trial defense counsels' decision not to call the appellant's father as a witness, we decline to rehash the discussion here.

### 16. *Failure to submit JEH's statement in sentencing*

At the Article 32, UCMJ, hearing, JEH stated he "doesn't want to see the accused prosecuted or sent to jail." The appellant now argues that the trial defense counsel's failure to admit this statement in sentencing seriously prejudiced his sentencing case.

In his affidavit, JOH (JEH's father), attested, "My son [JEH] has informed the District Attorney of Franklin County, Alabama, . . . that he does not wish to pursue any

criminal charges against [the appellant] and will not testify if called to do so in any criminal proceeding." The affidavit is dated 9 June 2010. Six months later JEH testified at the appellant's trial on 14 December 2010.

Independent of any credibility vulnerabilities the appellant's father may have had, and putting aside for the moment the double hearsay nature of the statement at issue here, JEH's desires with regard to whether the appellant would be prosecuted or incarcerated were thoroughly covered before the members during sentencing. On direct examination, JEH explained that his intentions changed during the trial. Specifically, he testified:

> I come in here, I told you, I told the defense counsel before I was ever brought up here that I was going to ask this court not to put this man in jail. I come up here with every intention of that and I forgave him. . . . I thought about this for the last year. I come in here and this man looked at me with the same hatred that he looked at me on the day he shot me and it changed my feelings. I don't know how to feel about the whole situation no more and I don't know what to say about nothing.

On cross examination, after being informed by the senior trial defense counsel that the appellant cried and became emotional when the court reviewed photographs of JEH's injuries, JEH evinced some willingness to again soften his opinion regarding the appellant's future.

Accordingly, although the record supports the appellant's allegation that his trial defense counsel did not attempt to admit JEH's pretrial statement expressing his desire not to see the appellant prosecuted, the substance of that statement was unmistakably presented to the members in the live testimony the members heard. Therefore we do not find trial defense counsel's failure to offer such pretrial statement to be ineffective. *See Strickland*, 466 U.S. 668.

*17. Failure to investigate or corroborate evidence for impeachment value*

The appellant avers that his trial defense counsel were ineffective by failing to investigate and or corroborate a Kentucky Fried Chicken (KFC) restaurant receipt purporting to show the appellant was at a KFC several miles away 15 minutes before the 9-1-1 call that reported the shooting.

Even if we were to assume that the appellant was present at the KFC when the receipt was generated, the appellant offers no other specific evidence that would permit meaningful, factual scrutiny of the proposition he appears to assert.[16] More importantly,

---

[16] Such specific evidence would include but not be limited to the appellant's route of travel, the speed with which he made the trip, and the distance between the KFC and JEH's home.

as there is no dispute that the appellant shot JEH, we find the appellant's claim meritless. *See Strickland*, 466 U.S. 668.

18. *Failure to confront JEH with his father's affidavit*

For the reasons noted in the analysis under paragraph 16 above, we find this claim meritless. *See Strickland*, 466 U.S. 668.

19. *Failure to confront JEH with his inconsistent pretrial admission*

During a pretrial interview with AFOSI regarding where and how close he was to the appellant just before he was shot, JEH stated "me and him's looking at each other dead in the eyes." The appellant now avers his trial defense counsel were ineffective by not confronting JEH with this statement as it reveals he could not have been 25 yards behind the appellant's car at that point.

It is uncontested that the appellant did not shoot JEH while they were face to face. Had that been the case, the bullet would have struck JEH in the stomach instead of the back. Rather, at some time after seeing the gun and or looking the appellant in the eye, JEH turned and began to run in order to put some distance between himself and the appellant. As he was fleeing, the appellant shot him in the back. Though there are some inconsistencies in the details between JEH's pretrial statement and his in court testimony,[17] we do not find any significant inconsistency in statements with which the appellant here takes issue. As such, we find nothing about the trial defense counsel's failure to confront JEH with this particular pretrial statement to constitute ineffectiveness. *See Strickland*, 466 U.S. 668.

20. *Failure to confront JEH with his Article 32, UCMJ, unsworn statements*

At the Article 32, UCMJ, hearing, JEH stated that, "I don't want that boy to go to prison," and that, "I was on methamphetamine at the time I got shot and probably provoked it." JEH also admitted on cross examination during findings that: because he was under the effects of methamphetamine, he was energetic and felt "10 feet tall and bullet proof;" that he "got upset because [the appellant] was talking about [JEH's] relatives;" that he was "angry," began "cussing," and "arguing" with the appellant; that he threw the wrench with the intention of breaking the window of the appellant's car; that the methamphetamines "could have made [him] a little angrier;" and that he, JEH, probably provoked the escalation in the confrontation.

---

[17] For example, JEH testified at trial that he took "probably 5 or 6 steps after throwing the wrench before being shot." In the statement he made to investigators, he said he took "maybe three" steps between throwing the wrench and being shot.

Though trial defense counsel may not have specifically confronted JEH with his Article 32, UCMJ, testimony regarding the events leading up to the shooting, or his feelings about whether the appellant should go to prison, the substance of that testimony was squarely covered in JEH's trial testimony. During that testimony trial defense counsel elicited that JEH was under the effects of methamphetamine and, in his opinion, "probably" provoked the escalation in the confrontation. We therefore find no merit in this allegation of error.[18]

21. *Failure to object to Dr. TK's surrogate testimony as an obvious Confrontation Clause violation*

Dr. (Major) TK, a medical doctor with limited trauma skills training, including a 2-week trauma course designed to provide trauma response and readiness training skills, was offered and accepted as an expert in the field of medicine without objection. After reviewing roughly 300 pages of medical records, he testified about the nature and long-term implications of JEH's injuries.[19] A 7-page transcription prepared by the surgeon who treated JEH, consisting of the typed summary of his observations, and the tests and other procedures performed during the course of JEH's emergency treatment, was offered and admitted as Prosecution Exhibit 17.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Mil. R. Evid. 702. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert, at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the members by the proponent of the

---

[18] Similarly, JEH's wishes about the prospect of the appellant being sent to prison were also presented to the members during his live testimony.

[19] Dr. TK testified that the bullet struck JEH a few inches to the left of his spine "around the area of the 11th and 12th ribs in the left posterior in the back." Upon entering his body and striking bone, it fragmented. A scan revealed metallic fragments in the lower part of his left lung, and in and around his spleen, with the largest fragment eventually coming to rest in an area under his left arm. After reviewing JEH's medical records, Dr. TK, who was familiar with the treatment of gunshot wounds, described the injuries as occurring to JEH's left thoraco-abdominal region, "defined by the level of the nipple in the front and the lower part of the ribs, including the back and the front of the chest, so it wraps all the way around [the body]." Regarding the location of bullet fragments in JEH, Dr. TK explained "[o]ftentimes when the bullet hits the ribs it will ricochet and change directions or fragment and those fragments can travel in different directions through the body."

opinion or inference unless the military judge determines that their probative value in assisting the members to evaluate the expert's opinion substantially outweighs their prejudicial effect. Mil. R. Evid. 703.

The last half decade or so has seen several judicially driven adjustments to confrontation clause jurisprudence, particularly in the area of urinalysis cases and the extent to which in-court experts may rely upon, and testify about, tests performed by other experts. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36 (2004); *United States v. Magyari*, 63 M.J. 123 (C.A.A.F. 2006); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *United States v. Blazier*, 68 M.J. 439 (C.A.A.F. 2010); *United States v. Blazier*, 69 M.J. 218 (C.A.A.F. 2010). "[M]ore recent case law demonstrates that the focus has to be on the purpose of the statements in the [document] itself." *Sweeney*, 70 M.J. at 302. Rephrased, "would it be reasonably foreseeable to an objective person that the purpose of any individual statement in [the document] is evidentiary?" *Id.* Although the appellant references *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), in his argument relative to this issue, we note *Bullcoming* was not decided until after the appellant's trial. Consequently, when assessing the professional reasonability of trial defense counsels' actions, we evaluate whether trial defense counsels' actions met prevailing professional norms, as informed by the state of the law, at that time. *Strickland*, 466 U.S. 668.

Having reviewed Dr. TK's testimony, we find nothing to suggest such testimony would have been facially objectionable under Mil. R. Evid. 702 or 703. Moreover, and with due regard for our superior court's recognition that "reasonable minds may disagree about what constitutes testimonial hearsay," *United States v. Blazier*, 69 M.J. 218, 222, Dr. TK's testimony was not akin to the type of testimonial hearsay found objectionable in the numerous urinalysis cases defining the boundaries of the confrontation clause in this context. Rather, it appeared to relay the type of information routinely contained in medical reports created for treatment purposes, which under then-existing Supreme Court precedent was unmistakably non-testimonial in nature. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009) ("Medical reports created for treatment purposes . . . would not be testimonial under our decision today."). Therefore, we reject the appellant's characterization of Dr. TK's testimony as an "obvious confrontation clause violation," and we do not find trial defense counsel's failure to object to such testimony to constitute ineffective assistance. *See Strickland*, 466 U.S. 668.

*22. Failure to confront Investigator GP about his demotion*

The appellant notes that Investigator GP was, at various times, referred to in the record as "Lt [GP], Sgt [GP]" and as "Deputy [GP]." Further, he argues that as the investigator was identified as a Lieutenant in a reported case in 2010, but referred to as a Sergeant in a newspaper article in 2012, the difference in the appellation used to identify him demonstrates that "sometime after [the appellant's] arrest and before his court-

martial, [GP] was demoted." The appellant characterizes his trial defense counsel's failure to confront Investigator GP about this demotion as ineffective assistance of counsel. We find the appellant's argument in this regard to be purely speculative, and therefore meritless.

*23. Failing to challenge or rebut testimony and argument implying JEH was responsible for $180,000 in medical bills*

We find the appellant's argument in this regard to be meritless. *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

*New Trial Petition*

On 11 March 2013, the appellant filed a Petition for a New Trial pursuant to Article 73, UCMJ, 10 U.S.C. § 873. He raised four separate errors under the two potential theories that would entitle him to a new trial under R.C.M. 1210(f): newly discovered evidence and fraud on the court. The appellant essentially claims entitlement to a new trial because: (1) his trial defense counsel committed fraud on the court when, at the beginning of trial, they represented that they were qualified and certified and hadn't acted in a manner that might have tended to disqualify them because they were in fact not sufficiently prepared – ergo not qualified – to try the case; (2) the trial defense counsels' numerous errors and failures, as addressed above, "constitute[d] constitutionally ineffective assistance of counsel and thus, negligently perpetuate[d] a fraud on the court-martial; (3) the Government's failure to comply with discovery and *Brady*[20] obligations contributed to fraud on the court-martial; and (4) newly discovered evidence would impeach JEH's credibility, corroborate the appellant's self-defense claim, and contradict that he had the required *mens rea* to be found guilty of attempted murder. We disagree.

*1. Timeliness*

Article 73, UCMJ, permits an appellant to petition for a new trial "[a]t any time within two years after approval by the convening authority of a court-martial sentence." In this case, the convening authority took action on 10 March 2011, two years and one day prior to the filing of the Petition. Because the appellant's claim was made beyond the time limitations as enacted by Congress, we dismiss it as untimely.

In *Bowles v. Russell*, 551 U.S. 205 (2007), the Supreme Court held that where a rule requiring the filing of an appeal within 14 days was based on a statute, the rule was mandatory and jurisdictional, and the appeals court erred by granting the litigant more time than the statutorily based rule permitted. Clarifying the distinction between filing time limits based on "court-promulgated rules and limits enacted by Congress," the Court

---

[20] *Brady v. Maryland*, 373 U.S. 83 (1963).

unambiguously held that whereas the former are not jurisdictional, the latter are. *Id.* at 212. It stated:

> Because Congress decides whether federal courts can hear cases at all, it can also determine when, and under what conditions, federal courts can hear them. Put another way, the notion of subject-matter jurisdiction obviously extends to classes of cases . . . falling within a court's adjudicatory authority, but it is no less jurisdictional when Congress prohibits federal courts from adjudicating an otherwise legitimate class of cases after a certain period has elapsed from final judgment. . . . As . . . long held, when an appeal has not been prosecuted in the manner directed, within the time limited by the acts of Congress, it must be dismissed for want of jurisdiction.

*Id.* at 213 (first omission in original) (citations and internal quotation marks omitted).

Our superior court took up this issue in *United States v. Rodriguez*, 67 M.J. 110 (C.A.A.F. 2009), a case examining whether that Court's 60-day filing deadline[21] was mandatory and jurisdictional or waivable at that Court's discretion. Citing *Bowles* and a line of cases out of the federal appellate courts following *Bowles*, the Court observed that "[w]hile the option of whether to petition or not petition the court rests with the appellant, . . . Congress established without qualification when such petitions must be filed. . . . within the sixty-day statutory time limit." *Id.* at 115. In so doing, the Court rejected reasoning it previously articulated in *United States v. Tamez*, 63 M.J. 202 (C.A.A.F. 2006), which had declared the 60-day time limit of Article 67(b), UCMJ, 10 U.S.C. § 867(b), to be waivable at the Court's discretion for "good cause shown." Although the Court limited its holding to petitions filed under Article 67, UCMJ, we find the rationale of *Bowles* and *Rodriguez* applicable to the case before us.

The appellant argues the two-year filing period referenced in Article 73, UCMJ, "simply is not jurisdictional, but is rather a 'claims processing' rule pursuant to [*Henderson v. Shinseki*, 131 S.Ct. 1197 (2011)]." The appellant characterized his Petition as a filing similar to the claim for disability compensation filed by the veteran with the U.S. Court of Appeals for Veterans Claims in *Shinseki*, a transaction "involv[ing] review by an Article I tribunal as part of a unique administrative scheme [regarding] . . . a claim-processing rule." Accordingly, the appellant argues, just as the 120-day filing rule in *Shinseki* was procedural and non-jurisdictional, so too is Article 73, UCMJ's, two-year filing rule.

---

[21] "The accused may petition the [Court] for review . . . within 60 days of the earlier of -- (1) the date on which the accused is notified of the decision . . . ; or (2) the date on which a copy of the decision of the Court . . . is [mailed]." Article 67(b), UCMJ, 10 U.S.C. § 867(b).

We understand *Rodriguez* to be binding and we shall follow it. *See, e.g.*, *United States v. Kelly*, 45 M.J. 259, 262 (C.A.A.F. 1996); *United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996). The differences between civil litigation and the veterans claims process are modest by comparison to the differences between the veterans claims process and criminal prosecutions under the UCMJ. We therefore find *Shinseki* inapposite to our analysis of the timeliness of the appellant's Petition. Because the two-year filing deadline under Article 73, UCMJ, is unambiguously statutorily based, we find it to be jurisdictional in nature. *Rodriguez*, 67 M.J. 110. Accordingly, we hold the appellant's Petition to have been untimely filed.

The appellant also urges us to find that the principle of equitable tolling provides a basis upon which to find his Petition to have been timely.[22] We decline to do so. Moreover, if we were to evaluate whether the appellant had articulated good cause for his untimely submission under the rationale of the dissenting judges in *Rodriguez*, we would find no such good cause. This is not a case wherein a newly assigned or requested military counsel received his client's request for some appellate action after a filing deadline had already passed, or where a service member received incorrect advice or inaction as a result of assistance provided by a military counsel furnished by the Government. Rather, the appellant retained a civilian appellate defense counsel in early February 2013. At the time civilian appellate counsel received a copy of the record of trial,[23] he was well aware that "Article 73 UCMJ's two year statute of limitations was dangerously close," suggesting, at the very least, he had ample time to evaluate his new trial theory and the approaching filing deadline, and to submit his petition within the required time limitations.

We note that were we not to have found the petition untimely, we would have also found it substantively without merit for the reasons that follow.

*2. Newly Discovered Evidence*

R.C.M. 1210(f) provides that "[a] new trial may be granted only on grounds of newly discovered evidence or fraud on the court-martial." R.C.M. 1210(f)(1). It further states that "[a] new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that: (A) The evidence was discovered after the trial; (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and (C) The newly discovered evidence, if

---

[22] The Supreme Court specifically withheld ruling on the issue of the applicability of equitable tolling to the 120-day time limit in *Henderson v. Shinseki*, 131 S.Ct. 1197 (2011). Further, in both *Bowles v. Russell*, 551 U.S. 205 (2007), and *United States v. Rodriguez*, 67 M.J. 110 (C.A.A.F. 2009), the Courts found that reviewing courts lacked authority to apply the doctrine of equitable tolling in cases involving the challenge of jurisdictionally-based filing deadlines.

[23] Though appellate civilian defense counsel does not specify the date on which he received the record of trial, the affidavits he references in his various post-trial submissions, including the new trial Petition, are dated between 19 February and 6 March 2013.

considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused. R.C.M. 1210(f)(2).

The provisions of Article 73, UCMJ, are not designed to permit an accused to relitigate matters which were presented below and decided adversely to him. *United States v. Bacon*, 12 M.J. 489 (C.A.A.F. 1982). New trial petitions based on a witness' recantation are not viewed favorably in the law. *United States v. Giambra*, 33 M.J. 331 (C.M.A. 1991). They should only be granted if the court is reasonably well satisfied that the testimony given by a material witness is false. *United States v. Rios*, 48 M.J. 261 (C.A.A.F. 1998). Furhtermore, courts may weigh testimony taken at trial against the post-trial evidence to determine which is credible. *Id.* "[A] reviewing court must make a credibility determination, insofar as it must determine whether the 'newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused. . . . The reviewing court does not determine whether the proffered evidence is true; nor does it determine historical facts. It merely decides if the evidence is sufficiently believable to make a more favorable result probable." *Luke*, 69 M.J. at 314 (citing *United States v. Brooks*, 49 M.J. 64, 69 (C.A.A.F. 1998)).

We find the appellant's submissions do not constitute newly discovered evidence under R.C.M. 1210.

Pastor Miller's affidavit recounts conversations he has had with JEH since the shooting, during which JEH allegedly recanted certain portions of his trial testimony. Specifically, Pastor Miller attested that JEH told him that, contrary to the distance JEH testified to at trial, JEH was actually closer to the car at the time the appellant fired the shot, and that at one point JEH did in fact move quickly toward the appellant's car during their argument. We find Pastor Miller's affidavit unpersuasive under *Rios*, 48 M.J. 261, insufficiently believable to make a more favorable result probable under *Luke*, and to constitute an improper attempt to relitigate matters already addressed in the trial below under *Bacon*, 12 M.J. 489.

A document appearing to be a printed version of an online newspaper article from the Franklin County Times, 20 December 2009 edition, identified JEH as one of several people arrested on 16 December 2009 for manufacturing methamphetamine. Therefore, the appellant argues now, JEH's statement at trial that he was unable to hold a job amounted to perjury because JEH actually "*was working. Working* illegally manufacturing methamphetamine." (Emphasis added). We reject this assertion on its face and find that it also fails to meet the requirements of R.C.M. 1210(f)(2)(B) and (C).

An affidavit by Pastor Jason Smith states that, in approximately September 2012, JEH began working at G&G Steel and now regularly engages in manual labor. The appellant submits this document in support of his assertion that JEH's statement at trial

about being unable to work constituted perjury. We reject the suggestion that JEH's ability to find a job involving physical labor some three years after the shooting, and two years after he testified to his then existing physical limitations at trial, renders his trial testimony perjurious. *Rios*, 48 M.J. 261.

Pastor Miller's affidavit also recounts a conversation he had with JEH's father, during which JEH's father suggested JEH was associated with Investigator GP (appellate counsel suggests as an informant), and that as a result thereof Investigator GP somehow shielded JEH from prosecution or lessened JEH's sentence for some unspecified illegal conduct. We find the assertion speculative and insufficiently detailed to constitute newly discovered evidence under R.C.M. 1210(f), unpersuasive under *Rios*, 48 M.J. 261, and insufficiently believable to make a more favorable result probable under *Luke*.

At trial, both the trial counsel and trial defense counsel were unaware that, following his arrest, the appellant had been confined at a jail in Franklin County, Alabama, for four days and then restricted to a barracks room at Columbus AFB, Mississippi, before being released to return to his unit. Consequently, the personal data sheet was incorrect insofar as it reflected no pretrial confinement time, and counsel were incorrect in their representation to the trial judge that the appellant had not been confined pretrial. Though the appellant's newly retained civilian defense counsel noted he did not discover the information about the pretrial confinement until late-February 2013, he fails to articulate how this information constitutes grounds for a new trial under R.C.M. 1210(f)(2) (B) and (C), other than as support for his "fraud on the court" theory addressed below, which we also find unpersuasive.

Nevertheless, the appellant should have received confinement credit for the four days he served in the Franklin County jail. *See United States v. Murray*, 43 M.J. 507 (A.F. Ct. Crim. App. 1995). We therefore order his sentence to be reduced by four days, as further particularized in the decretal paragraph below.

*3. Fraud on the Court*[24]

"No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3).

The appellant argues that: (1) his trial defense counsel committed fraud on the court-martial when, at the beginning of trial, they represented that they were qualified and certified and hadn't acted in a manner that might have tended to disqualify them

---

[24] The appellant initially raised this issue in a Petition for New Trial, dated 11 March 2013. As noted above, we granted the appellant's 4 September 2013 request that we consider the matters raised in his Petition for a New Trial as supplemental assignments of error under *United States v. Luke*, 69 M.J. 309 (C.A.A.F. 2011) (applying the analytical framework of R.C.M. 1210 to govern a supplemental assignment of error substantively presented as a new trial petition).

because they were in fact not sufficiently prepared—ergo not qualified—to try the case; and (2) the Government's failure to comply with discovery and *Brady*[25] obligations contributed to the fraud on the court-martial.

As noted above, the crux of the appellant's fraud on the court theory rests on the 23 separately alleged instances of his trial defense counsels' ineffectiveness addressed previously.[26] More particularly, the appellant argues that these alleged instances of ineffectiveness demonstrate that his trial defense counsel's statement to the court-martial that they were qualified and certified to represent him was fraudulently untrue because they were in fact not sufficiently prepared or skilled to represent their client effectively. Ergo, goes the argument, they committed fraud on the court by saying they were.

Though novel, we reject the appellant's attempt to recast what appears to be an ineffective assistance of counsel claim as a fraud on the court warranting a new trial under Article 73, UCMJ, or R.C.M. 1210(f)(3). *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

*Appellate Discovery*

In his 26 March 2013 post-trial Motion for Appropriate Relief, the appellant requested that we order: (1) appellate discovery of various documents and/or records; and (2) replacement of certain pages or items from the record of trial provided to him in confinement that were either missing or were otherwise unclear or had been redacted in certain respects.[27] On the first issue, the appellant asked this Court, pursuant to the Sixth Amendment, Articles 46 and 73, UCMJ, 10 U.S.C. §§ 846, 873, and our authority under the All Writs Act, to order the production of numerous records, documents, and responses to specific interrogatories from various state, federal, and municipal agencies. On the second issue, he requested this Court to order the Government to give his civilian appellate defense counsel an unredacted and legible copy of the complete record of trial.

The appellant's request falls squarely under *United States. v. Campbell*, 57 M.J. 134 (C.A.A.F. 2002), which requires that we consider, among other things: (1) whether the defense has made a colorable showing that the evidence or information

---

[25] *Brady v. Maryland*, 373 U.S. 83 (1963).

[26] The appellant's multiple filings following his retention of civilian defense counsel in February 2013 appear to raise numerous allegations of legal error, but the organizational scheme of those filings, in combination with the extent to which they overlap, restate, and/or cross-reference one another in various respects, muddles specific allegations of error with other information presumably included as background or contextual reference. We have therefore addressed those allegations of ineffective assistance of counsel the appellant identifies in his brief under the subject heading "Specific Issues" as supplemental assignments of error.

[27] The redacted or removed items include: photographs of the victim and his wounds; certain pictures of the appellant's vehicle that showed the rear license plate (numerous other photographs of the same vehicle not showing the license plate—or the license plate of another vehicle—were apparently not removed); home addresses and/or phone numbers; and a video recording of the crime scene.

exists; (2) whether or not the evidence or information sought was previously discoverable with due diligence; (3) whether the putative information is relevant to the appellant's asserted claim or defense; and (4) whether there is a reasonable probability that the result of the proceeding would have been different if the putative information had been disclosed. *Id*. at 138.

Appellant's request for discovery falls short of meeting the now well-established requirements articulated in *Campbell,* 57 M.J. 134. As a threshold, general matter, the appellant's motion is completely silent as to what efforts – if any – were at any time undertaken in the exercise of due diligence to secure materials appellant now seeks.

Additionally, the existence and or relevance of certain other materials appellant now requests, including information about Investigator GP's employment history or information appellant suspects would identify the victim as an informant for Investigator GP is based purely on speculation.

Certain other materials he requests are irrelevant entirely. For example, the firearms expert's bench notes and associated records are irrelevant because the appellant does not refute that he fired the bullet that struck the victim. Similarly, diagrams, documents, or reports demonstrating the trajectory of the bullet after it entered JEH would not support appellant's case. The appellant argues that the path between the bullet's entry wound and where the largest fragment stopped after entering the victim supports the appellant's version of events and weakens the victim's. He does so, presumably, by suggesting that the upward trajectory of the bullet fragment removed from under the victim's left arm is more consistent with the appellant's statement that he fired a shot up into the air over his shoulder than it is with the victim's assertion that the appellant shot him in the back as he was running away. We find such an argument unpersuasive, and by implication the sought diagrams etc., irrelevant, because Dr. TK explained that bullets often ricochet off bones and change directions after entering the body, and because bullet fragments were found in several locations in the victim's thoraco-abdominal area.

The appellant has failed to meet his threshold burden of demonstrating that some measure of appellate inquiry is warranted. We further find the other bases he cites to support his request for the materials without merit. Accordingly, his Motion for Appropriate Relief is denied.

*Incomplete Record of Trial*

"A copy of the record of the proceedings of each general and special court-martial shall be given to the accused as soon as it is authenticated." Article 54(d), UCMJ, 10 U.S.C. § 854(d); *see also* R.C.M. 1104(b)(1) ("trial counsel shall cause a copy of the record of trial to be served on the accused as soon as . . . authenticated"); Air Force Court

of Criminal Appeals Rules of Practice and Procedure, Rule 12 ("Ordinarily, civilian counsel will use the accused's copy of the record. Civilian counsel may reproduce, at no expense to the Government, appellate defense counsel's copy of the record.").

The appellant's request appears to have been at least partially mooted by his civilian appellate counsel's receipt of a digital version of the record. We have no indication that the record provided to military appellate counsel is incomplete. To the extent the appellant or his civilian defense counsel are unable to secure access to record of trial-related materials under our rules, the appellant is free to readdress that issue with this Court.

*Sentence Reassessment*

As we have dismissed Charges II and III, we must assess the impact on the sentence and either return the case for a sentence rehearing or reassess the sentence ourselves. Before reassessing a sentence, we must be confident "that, absent the error, the sentence would have been of at least a certain magnitude." *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002) (citing *United States v. Sales*, 22 M.J. 305, 308 (C.M.A.1986)). A "dramatic change in the 'penalty landscape'" lessens our ability to reassess a sentence. *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003). Ultimately, a sentence can be reassessed only if we "confidently can discern the extent of the error's effect on the sentencing authority's decision." *United States v. Reed*, 33 M.J. 98, 99 (C.M.A. 1991), *aff'd*, 36 M.J. 43 (C.M.A. 1992) (mem.). Even within this limit, we must determine that a sentence we propose to affirm is "appropriate," under Article 66(c), UCMJ. In short, a reassessed sentence must be purged of prejudicial error and also must be "appropriate" for the offense involved. *Sales*, 22 M.J. at 307-08.

We have set aside two of the three charges in this case, all of which indisputably arose from the same set of facts. However, because all of the charges were merged for sentencing purposes, our holding would have no impact on the maximum sentence the appellant faced. The military judge clearly instructed the members that the charges were multiplicious for sentencing purposes, directing them "[t]herefore, in determining an appropriate sentence in this case, *you must consider them as one offense*." (Emphasis added.). Moreover, the gravamen of the appellant's offense, as presented and argued by the Government, revolved around a single crime and a single theory, that the appellant's actions – shooting JEH in the back – amounted to attempted unpremeditated murder. The crime carries a maximum imposable confinement period of life without the possibility of parole, *MCM*, ¶ 43.e.(2), yet the sentence imposed by the members was considerably more lenient. We therefore conclude our holding would not alter the penalty landscape, substantially influence the sentence, or materially prejudice the appellant's substantial rights. Accordingly, under the facts and circumstances of this case, and considering the relative severity of the charges, we are confident that the members would have imposed

at least a dishonorable discharge, confinement for 11 years, forfeiture of all pay and allowances, and reduction to E-1.

In reaching this conclusion, we have given individualized consideration to this particular appellant, the nature and seriousness of the offenses of which he was convicted, his record of service, and all other matters properly before the panel in the sentencing phase of the court-martial. *See United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982); *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 35 (C.A.A.F. 2007). We find that the adjudged and approved sentence was appropriate in this case and was not inappropriately severe.

*Conclusion*

The appellant's request for appellate discovery is denied. The appellant's petition for a new trial is denied. Charges II and III are dismissed. We affirm only so much of the sentence as includes a dishonorable discharge, confinement for 10 years and 361 days, and reduction to E-1. The remaining findings, and the sentence as modified and reassessed, are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred.[28] Articles 59(a) and 66(c), UCMJ; *Reed*, 54 M.J. at 41. Accordingly, the remaining findings and sentence, as modified and reassessed, are

AFFIRMED.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[28] Though not raised as an issue on appeal, we note that the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Having considered the totality of the circumstances and the entire record, we find that the appellate delay in this case was harmless beyond a reasonable doubt. *Id.* at 135-36 (reviewing claims of post-trial and appellate delay using the four-factor analysis found in *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). *See also United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).